# UNITED STATES *v.* KOKINDA ET AL.

No. 88–2031.   Argued February 26, 1990—Decided June 27, 1990

O'CONNOR, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and WHITE and SCALIA, JJ., joined. KENNEDY, J., filed an opinion concurring in the judgment, *post*, p. 737. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and STEVENS, JJ., joined, and in which BLACKMUN, J., joined as to Part I, *post*, p. 740.

*Deputy Solicitor General Roberts* argued the cause for the United States. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Dennis*, and *Thomas E. Booth.*

*Jay Alan Sekulow* argued the cause for respondents. With him on the briefs was *James M. Henderson, Sr.**

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SCALIA join.

We are called upon in this case to determine whether a United States Postal Service regulation that prohibits

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Steven R. Shapiro;* for the American Federation of Labor and Congress of Industrial Organizations by *Marsha S. Berzon* and *Laurence Gold;* for Free Speech Advocates by *Thomas Patrick Monaghan;* for the National Committee of the Libertarian Party et al. by *Frank M. Dunbaugh;* for the International Society for Krishna Consciousness of California, Inc., by *David M. Liberman;* for Newport News Daily Press et al. by *Alice Neff Lucan, Richard P. Holme, Lawrence J. Aldrich, Boisfeuillet Jones, Jr., Alexander Wellford,* and *David C. Kohler;* and for Project for Public Spaces, Inc., by *Andrew J. Ekonomou.*

"[s]oliciting alms and contributions" on postal premises violates the First Amendment. We hold the regulation valid as applied.

I

The respondents in this case, Marsha B. Kokinda and Kevin E. Pearl, were volunteers for the National Democratic Policy Committee, who set up a table on the sidewalk near the entrance of the Bowie, Maryland, Post Office to solicit contributions, sell books and subscriptions to the organization's newspaper, and distribute literature addressing a variety of political issues. The postal sidewalk provides the sole means by which customers of the post office may travel from the parking lot to the post office building and lies entirely on Postal Service property. The District Court for the District of Maryland described the layout of the post office as follows:

> "[T]he Bowie post office is a freestanding building, with its own sidewalk and parking lot. It is located on a major highway, Route 197. A sidewalk runs along the edge of the highway, separating the post office property from the street. To enter the post office, cars enter a driveway that traverses the public sidewalk and enter a parking lot that surrounds the post office building. Another sidewalk runs adjacent to the building itself, separating the parking lot from the building. Postal patrons must use the sidewalk to enter the post office. The sidewalk belongs to the post office and is used for no other purpose." App. to Pet. for Cert. 24a.

During the several hours that respondents were at the post office, postal employees received between 40 and 50 complaints regarding their presence. The record does not indicate the substance of the complaints with one exception. One individual complained "because she knew the Girl Scouts were not allowed to sell cookies on federal property." 866 F. 2d 699, 705 (CA4 1989). The Bowie postmaster asked respondents to leave, which they refused to do. Postal inspec-

tors arrested respondents, seizing their table as well as their literature and other belongings.

Respondents were tried before a United States Magistrate in the District of Maryland and convicted of violating 39 CFR § 232.1(h)(1) (1989), which provides in relevant part:

> "Soliciting alms and contributions, campaigning for election to any public office, collecting private debts, commercial soliciting and vending, and displaying or distributing commercial advertising on postal premises are prohibited."

Respondent Kokinda was fined $50 and sentenced to 10 days' imprisonment; respondent Pearl was fined $100 and received a 30-day suspended sentence under that provision.

Respondents appealed their convictions to the District Court, asserting that application of § 232.1(h)(1) violated the First Amendment. The District Court affirmed their convictions, holding that the postal sidewalk was not a public forum and that the Postal Service's ban on solicitation is reasonable.

A divided panel of the United States Court of Appeals for the Fourth Circuit reversed. 866 F. 2d 699 (1989). The Court of Appeals held that the postal sidewalk is a traditional public forum and analyzed the regulation as a time, place, and manner regulation. The court determined that the Government has no significant interest in banning solicitation and that the regulation is not narrowly tailored to accomplish the asserted governmental interest.

The United States' petition for rehearing and a suggestion for rehearing en banc were denied. Because the decision below conflicts with other decisions by the Courts of Appeals, see *United States* v. *Belsky,* 799 F. 2d 1485 (CA11 1986); *United States* v. *Bjerke,* 796 F. 2d 643 (CA3 1986), we granted certiorari. 493 U. S. 807 (1989).

## II

Solicitation is a recognized form of speech protected by the First Amendment. See *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 629 (1980); *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 788–789, (1988). Under our First Amendment jurisprudence, we must determine the level of scrutiny that applies to the regulation of protected speech at issue.

The Government's ownership of property does not automatically open that property to the public. *United States Postal Service* v. *Council of Greenburgh Civic Assns.*, 453 U. S. 114, 129 (1981). It is a long-settled principle that governmental actions are subject to a lower level of First Amendment scrutiny when "the governmental function operating . . . [is] not the power to regulate or license, as lawmaker, . . . but, rather, as proprietor, to manage [its] internal operation[s] . . . ." *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 896 (1961). That distinction was reflected in the plurality opinion in *Lehman* v. *City of Shaker Heights*, 418 U. S. 298 (1974), which upheld a ban on political advertisements in city transit vehicles:

> "Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce. . . . The car card space, although incidental to the provision of public transportation, is a part of the commercial venture. In much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles." *Id.*, at 303.

The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business, but its action

is valid in these circumstances unless it is unreasonable, or, as was said in *Lehman,* "arbitrary, capricious, or invidious." *Ibid.* In *Lehman,* the plurality concluded that the ban on political advertisements (combined with the allowance of other advertisements) was permissible under this standard:

> "Users [of the transit system] would be subjected to the blare of political propaganda. There could be lurking doubts about favoritism, and sticky administrative problems might arise in parceling out limited space to eager politicians. In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation. Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require." *Id.,* at 304.

Since *Lehman,* "the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum." *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.,* 473 U. S. 788, 800 (1985). In *Perry Education Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37 (1983), the Court announced a tripartite framework for determining how First Amendment interests are to be analyzed with respect to Government property. Regulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny. *Id.,* at 45. Regulation of speech on property that the Government has expressly dedicated to speech activity is also

examined under strict scrutiny. *Ibid.* But regulation of speech activity where the Government has not dedicated its property to First Amendment activity is examined only for reasonableness. *Id.*, at 46.

Respondents contend that although the sidewalk is on Postal Service property, because it is not distinguishable from the municipal sidewalk across the parking lot from the post office's entrance, it must be a traditional public forum and therefore subject to strict scrutiny. This argument is unpersuasive. The mere physical characteristics of the property cannot dictate forum analysis. If they did, then *Greer* v. *Spock*, 424 U. S. 828 (1976), would have been decided differently. In that case, we held that even though a military base permitted free civilian access to certain unrestricted areas, the base was a nonpublic forum. The presence of sidewalks and streets within the base did not require a finding that it was a public forum. *Id.*, at 835–837.

The postal sidewalk at issue does not have the characteristics of public sidewalks traditionally open to expressive activity. The municipal sidewalk that runs parallel to the road in this case is a public passageway. The Postal Service's sidewalk is not such a thoroughfare. Rather, it leads only from the parking area to the front door of the post office. Unlike the public street described in *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640 (1981), which was "continually open, often uncongested, and constitute[d] not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people [could] enjoy the open air or the company of friends and neighbors in a relaxed environment," *id.*, at 651, the postal sidewalk was constructed solely to provide for the passage of individuals engaged in postal business. The sidewalk leading to the entry of the post office is not the traditional public forum sidewalk referred to in *Perry*.

Nor is the right of access under consideration in this case the quintessential public sidewalk which we addressed in

*Frisby* v. *Schultz*, 487 U. S. 474 (1988) (residential sidewalk). The postal sidewalk was constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city. The dissent would designate all sidewalks open to the public as public fora. See *post*, at 745 ("[T]hat the walkway at issue is a sidewalk open and accessible to the general public is alone sufficient to identify it as a public forum"). That, however, is not our settled doctrine. In *United States* v. *Grace*, 461 U. S. 171 (1983), we did not merely identify the area of land covered by the regulation as a sidewalk open to the public and therefore conclude that it was a public forum:

> "The sidewalks comprising the outer boundaries of the Court grounds are indistinguishable from any other sidewalks in Washington, D. C., and we can discern no reason why they should be treated any differently. Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property. In this respect, the present case differs from *Greer* v. *Spock* . . . . In *Greer*, the streets and sidewalks at issue were located within an enclosed military reservation, Fort Dix, N. J., and were thus separated from the streets and sidewalks of any municipality. That is not true of the sidewalks surrounding the Court. There is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id.*, at 179–180 (footnote omitted).

*Grace* instructs that the dissent is simply incorrect in asserting that every public sidewalk is a public forum. *Post*, at 745. As we recognized in *Grace*, the location and purpose

of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum.

The dissent's attempt to distinguish *Greer* is also unpersuasive. The dissent finds *Greer* "readily distinguishable" because the sidewalk in that case "was not truly 'open' to the public." *Post,* at 748, n. 5. This assertion is surprising in light of JUSTICE BRENNAN's description of the public access permitted in *Greer:*

> "No entrance to the Fort is manned by a sentry or blocked by any barrier. The reservation is crossed by 10 paved roads, including a major state highway. Civilians without any prior authorization are regular visitors to unrestricted areas of the Fort or regularly pass through it, either by foot or by auto, at all times of the day and night. Civilians are welcome to visit soldiers and are welcome to visit the Fort as tourists. They eat at the base and freely talk with recruits in unrestricted areas. Public service buses, carrying both civilian and military passengers, regularly serve the base. A 1970 traffic survey indicated that 66,000 civilian and military vehicles per day entered and exited the Fort. Indeed, the reservation is so open as to create a danger of muggings after payday and a problem with prostitution." 424 U. S., at 851 (dissenting opinion).

In *Greer* we held that the power of the Fort's commanding officer summarily to exclude civilians from the area of his command demonstrated that "[t]he notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is . . . historically and constitutionally false." *Id.,* at 838. It is the latter inquiry that has animated our traditional public forum analysis, and that we apply today. Postal entryways, like the walkways at issue in *Greer,* may be open to the public, but that fact alone does not establish that such areas must be treated as traditional public fora under the First Amendment.

The Postal Service has not expressly dedicated its sidewalks to any expressive activity. Indeed, postal property is expressly dedicated to only one means of communication: the posting of public notices on designated bulletin boards. See 39 CFR § 232.1(o) (1989). No Postal Service regulation opens postal sidewalks to any First Amendment activity. To be sure, individuals or groups have been permitted to leaflet, speak, and picket on postal premises, see Reply Brief for United States 12; 43 Fed. Reg. 38824 (1978), but a regulation prohibiting disruption, 39 CFR § 232(1)(e) (1989), and a practice of allowing some speech activities on postal property do not add up to the dedication of postal property to speech activities. We have held that "[t]he government does not create a public forum by . . . *permitting* limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U. S., at 802 (emphasis added); see also *Perry*, 460 U. S., at 47 ("[S]elective access does not transform government property into a public forum"). Even conceding that the forum here has been dedicated to some First Amendment uses, and thus is not a purely nonpublic forum, under *Perry*, regulation of the reserved nonpublic uses would still require application of the reasonableness test. See *Cornelius, supra,* at 804–806.

Thus, the regulation at issue must be analyzed under the standards set forth for nonpublic fora: It must be reasonable and "not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry, supra,* at 46. Indeed, "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius, supra,* at 806. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation." 473 U. S., at 808.

## III

The history of regulation of solicitation in post offices demonstrates the reasonableness of the provision here at issue. The Postal Service has been regulating solicitation at least since 1958. Before enactment of the 1970 Postal Reorganization Act, Pub. L. 91–375, 84 Stat. 720, 39 U. S. C. § 201 *et seq.*, the Post Office Department's internal guidelines "strictly prohibited" the "[s]oliciting [of] subscriptions, canvassing for the sale of any article, or making collections . . . in buildings operated by the Post Office Department, or on the grounds or sidewalks within the lot lines" of postal premises. Postal Service Manual, Facilities Transmittal Letter 8, Buildings Operation: Buildings Operated by the Post Office Department § 622.8 (July 1958). The Department prohibited all forms of solicitation until 1963, at which time it created an exception to its categorical ban on solicitation to enable certain "established national health, welfare, and veterans' organizations" to conduct fund drives "at or within" postal premises with the local postmaster's permission, and at his discretion. See Facilities Transmittal Letter 53, Buildings Operation: Buildings Operated by the Post Office Department § 622.8 (July 1963). The general prohibition on solicitation was enlarged in 1972 to include "[s]oliciting alms and contributions or collecting private debts on postal premises." 37 Fed. Reg. 24347 (1972), codified at 39 CFR § 232.6(h)(1) (1973).

Soon after the 1972 amendment to the regulation, the Service expanded the exemption to encompass "[n]ational organizations which are wholly nonprofit in nature and which are devoted to charitable or philanthropic purposes" and "[l]ocal charitable and other nonprofit organizations," 39 CFR §§ 232.6(h)(2), (3) (1974), and to permit these organizations to "request use of lobby space for annual or special fund raising campaigns, providing they do not interfere with the transaction of postal business or require expenditures by the Postal Service or the use of its employees or equip-

ment." 38 Fed. Reg. 27824–27825 (1973), codified at 39 CFR § 232.16(h)(2) (1974). Finally, in 1978, the Service promulgated the regulation at issue here. After 15 years of providing various exceptions to its rule against solicitation, the Service concluded that a categorical ban on solicitation was necessary, because the "Postal Service lacks the resources to enforce such regulation in the tens of thousands of post offices throughout the nation. In addition, such regulation would be, of necessity, so restrictive as to be tantamount to prohibition, and so complex as to be unadministrable." 43 Fed. Reg. 38824 (1978).

"[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Heffron,* 452 U. S., at 650–651. The purpose of the forum in this case is to accomplish the most efficient and effective postal delivery system. See 39 U. S. C. §§ 403(a), 403(b)(1); H. R. Rep. No. 91–1104, pp. 1, 5, 11–12, 17, 19 (1970). Congress has made clear that "it wished the Postal Service to be run more like a business than had its predecessor, the Post Office Department." *Franchise Tax Board of California* v. *United States Postal Service,* 467 U. S. 512, 519–520, and n. 13 (1984). Congress has directed the Service to become a self-sustaining service industry and to "seek out the needs and desires of its present and potential customers — the American public" and to provide services in a manner "responsive" to the "needs of the American people." H. R. Rep. No. 91–1104, *supra,* at 19–20. The Postal Service has been entrusted with this mission at a time when the mail service market is becoming much more competitive. It is with this mission in mind that we must examine the regulation at issue.

The Government asserts that it is reasonable to restrict access of postal premises to solicitation, because solicitation is inherently disruptive of the Postal Service's business. We

agree. "Since the act of soliciting alms or contributions usually has as its objective an immediate act of charity, it has the potentiality for evoking highly personal and subjective reactions. Reflection usually is not encouraged, and the person solicited often must make a hasty decision whether to share his resources with an unfamiliar organization while under the eager gaze of the solicitor." 43 Fed. Reg. 38824 (1978).

The dissent avoids determining whether the sidewalk is a public forum because it believes the regulation, 39 CFR § 232.1(h) (1989), does not pass muster even under the reasonableness standard applicable to nonpublic fora. In concluding that § 232.1(h) is unreasonable, the dissent relies heavily on the fact that the Service permits other types of potentially disruptive speech on a case-by-case basis. The dissent's criticism in this regard seems to be that solicitation is not receiving the same treatment by the Postal Service that other forms of speech receive. See *post*, at 760 (criticizing "inconsistent treatment"). That claim, however, is more properly addressed under the equal protection component of the Fifth Amendment. In any event, it is anomalous that the Service's allowance of some avenues of speech would be relied upon as evidence that it is impermissibly suppressing other speech. If anything, the Service's generous accommodation of some types of speech testifies to its willingness to provide as broad a forum as possible, consistent with its postal mission. The dissent would create, in the name of the First Amendment, a disincentive for the Government to dedicate its property to any speech activities at all. In the end, its approach permits it to sidestep the single issue before us: Is the Government's prohibition of *solicitation* on postal sidewalks *unreasonable?*

Whether or not the Service permits other forms of speech, which may or may not be disruptive, it is not unreasonable to prohibit solicitation on the ground that it is unquestionably a particular form of speech that is disruptive of business. So-

licitation impedes the normal flow of traffic. See *Heffron, supra,* at 653. Solicitation requires action by those who would respond: The individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card. See Record, Exh. 5 (credit card receipt); see also *United States* v. *Belsky,* 799 F. 2d 1485, 1489 (CA11 1986) ("Soliciting funds is an inherently more intrusive and complicated activity than is distributing literature"). As residents of metropolitan areas know from daily experience, confrontation by a person asking for money disrupts passage and is more intrusive and intimidating than an encounter with a person giving out information. One need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand, but one must listen, comprehend, decide, and act in order to respond to a solicitation. Solicitors can achieve their goal only by "stopping [passersby] momentarily or for longer periods as money is given or exchanged for literature" or other items. *Heffron, supra,* at 653 (upholding stringent restrictions on the location of sales and solicitation activity). JUSTICE BLACKMUN noted this distinction in his opinion concurring in part and dissenting in part to *Heffron:*

> "The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead, the recipient is free to read the message at a later time. . . . [S]ales and the collection of solicited funds not only require the fairgoer to stop, but also 'engender additional confusion . . . because they involve acts of exchanging articles for money, fumbling for and dropping money, making change, etc.'" 452 U. S., at 665 (citation omitted).

This description of the disruption and delay caused by solicitation rings of "common-sense," *ibid.,* which is sufficient

in this Court to uphold a regulation under reasonableness review.

The Postal Service's judgment is based on its long experience with solicitation. It has learned from this experience that because of a continual demand from a wide range of groups for permission to conduct fundraising or vending on postal premises, postal facility managers were distracted from their primary jobs by the need to expend considerable time and energy fielding competing demands for space and administering a program of permits and approvals. See Tr. of Oral Arg. 9 ("The Postal Service concluded after an experience with limited solicitation that there wasn't enough room for everybody who wanted to solicit on postal property and further concluded that allowing limited solicitation carried with it more problems than it was worth"). Thus, the Service found that "even the limited activities permitted by [its] program . . . produced highly unsatisfactory results." 42 Fed. Reg. 63911 (1977). It is on the basis of this real-world experience that the Postal Service enacted the regulation at issue in this case. The Service also enacted regulations barring deposit or display of written materials except on authorized bulletin boards "to regain space for the effective display of postal materials and the efficient transaction of postal business, eliminate safety hazards, reduce maintenance costs, and improve the appearance of exterior and public-use areas on postal premises." 43 Fed. Reg. 38824 (1978); see 39 CFR § 232.1(o) (1989). In short, the Postal Service has prohibited the use of its property and resources where the intrusion creates significant interference with Congress' mandate to ensure the most effective and efficient distribution of the mails. This is hardly unreasonable.

The dissent concludes that the Service's administrative concerns are unreasonable, largely because of the existence of less restrictive alternatives to the regulations at issue. See *post*, at 761–763. Even if more narrowly tailored regulations could be promulgated, however, the Postal Service is

only required to adopt *reasonable* regulations, not "the most reasonable or the only reasonable" regulation possible. *Cornelius*, 473 U. S., at 808.

The dissent also would strike the regulation on the ground that the Postal Service enacted it because solicitation "would be likely to produce hostile reactions and to cause people to avoid post offices." 43 Fed. Reg. 38824 (1978). The dissent reads into the Postal Service's realistic concern with losing postal business because of the uncomfortable atmosphere created by aggressive solicitation an intent to suppress certain views. See *post*, at 754. But the Postal Service has never intimated that it intends to suppress the views of any "disfavored or unpopular political advocacy group." *Ibid.* It is the inherent nature of solicitation itself, a content-neutral ground, that the Service justifiably relies upon when it concludes that solicitation is disruptive of its business. The regulation is premised on the Service's long experience, on the fact that solicitation is inherently more disruptive than the other speech activities it permits, and on the Service's empirically based conclusion that a case-by-case approach to regulation of solicitation is unworkable.

Clearly, the regulation does not discriminate on the basis of content or viewpoint. Indeed, "[n]othing suggests the Postal Service intended to discourage one viewpoint and advance another. . . . By excluding all . . . groups from engaging in [solicitation] the Postal Service is not granting to 'one side of a debatable public question . . . a monopoly in expressing its views.'" *Monterey County Democratic Central Committee* v. *United States Postal Service*, 812 F. 2d 1194, 1198–1199 (CA9 1987) (citation omitted). The Service's concern about losing customers because of the potentially unpleasant situation created by solicitation *per se* does not reveal "an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U. S., at 45–46.

It is clear that this regulation passes constitutional muster under the Court's usual test for reasonableness. See *Lehman,* 418 U. S., at 303; *Cornelius, supra,* at 808. Accordingly, we conclude, as have the Courts of Appeals for the Third and Eleventh Circuits, that the Postal Service's regulation of solicitation is reasonable as applied. See *United States* v. *Belsky,* 799 F. 2d 1485 (CA11 1986); *United States* v. *Bjerke,* 796 F. 2d 643 (CA3 1986).

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE KENNEDY, concurring in the judgment.

I agree that the postal regulation reviewed here does not violate the First Amendment. Because my analysis differs in essential respects from that in JUSTICE O'CONNOR's opinion, a separate statement of my views is required.

Many of those who use postal facilities do so from necessity, not choice. They must go to a post office to conduct their business and personal correspondence, carrying cash for stamps or money orders. While it is legitimate for the Postal Service to ensure convenient and unimpeded access for postal patrons, the public's use of postal property for communicative purposes means that the surrounding walkways may be an appropriate place for the exercise of vital rights of expression. As society becomes more insular in character, it becomes essential to protect public places where traditional modes of speech and forms of expression can take place. It is true that the uses of the adjacent public buildings and the needs of its patrons are an important part of a balance, but there remains a powerful argument that, because of the wide range of activities that the Government permits to take place on this postal sidewalk, it is more than a nonpublic forum.

This is so even though the Government may intend to impose some limitations on the forum's use. If our public forum jurisprudence is to retain vitality, we must recognize that certain objective characteristics of Government property and its customary use by the public may control the

case. See, *e. g.*, *Cornelius* v. *NAACP Legal Defense &
Educational Fund, Inc.*, 473 U. S. 788, 819–820 (1985)
(BLACKMUN, J., dissenting). While it is proper to weigh the
need to maintain the dignity and purpose of a public build-
ing, see *United States* v. *Grace*, 461 U. S. 171, 182 (1983),
or to impose special security requirements, see *Adderley* v.
*Florida*, 385 U. S. 39 (1966), other factors may point to the
conclusion that the Government must permit wider access to
the forum than it has otherwise intended. Viewed in this
light, the demand for recognition of heightened First Amend-
ment protection has more force here than in those instances
where the Government created a nontraditional forum to ac-
commodate speech for a special purpose, as was thought true
with teachers' mailboxes in *Perry Education Assn.* v. *Perry
Local Educators' Assn.*, 460 U. S. 37 (1983), or the Com-
bined Federal Campaign in *Cornelius, supra.*

It is not necessary, however, to make a precise determina-
tion whether this sidewalk and others like it are public or
nonpublic forums; in my view, the postal regulation at issue
meets the traditional standards we have applied to time,
place, and manner restrictions of protected expression. See
*Clark* v. *Community for Creative Non-Violence*, 468 U. S.
288, 293 (1984).

"[E]ven in a public forum the government may impose rea-
sonable restrictions on the time, place, or manner of pro-
tected speech, provided the restrictions 'are justified without
reference to the content of the regulated speech, that they
are narrowly tailored to serve a significant governmental in-
terest, and that they leave open ample alternative channels
for communication of the information.'" *Ward* v. *Rock
Against Racism*, 491 U. S. 781, 791 (1989) (quoting *Clark,
supra*, at 293). The regulation, in its only part challenged
here, goes no further than to prohibit personal solicita-
tions on postal property for the immediate payment of
money. The regulation, as the United States concedes, ex-
pressly permits the respondents and all others to engage in

political speech on topics of their choice and to distribute literature soliciting support, including money contributions, provided there is no in-person solicitation for payments on the premises. See Brief for United States 39.

Just as the government has a significant interest in preventing "visual blight" in its cities, *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 810 (1984), in "maintaining [public] parks . . . in an attractive and intact condition," *Clark, supra,* at 296, and in "avoiding congestion and maintaining the orderly movement" of persons using a public forum, *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 652 (1981), so the Government here has a significant interest in protecting the integrity of the purposes to which it has dedicated the property, that is, facilitating its customers' postal transactions. Given the Postal Service's past experience with expressive activity on its property, I cannot reject its judgment that in-person solicitation deserves different treatment from alternative forms of solicitation and expression. Cf. *id.,* at 665 (BLACKMUN, J., concurring in part and dissenting in part). The same judgment has been made for the classic public forums in our Nation's capital. The solicitation of money is banned in the District of Columbia on the Mall and other parks under the control of the National Park Service. See 36 CFR § 7.96(h) (1989).

The Postal Service regulation, narrow in its purpose, design, and effect, does not discriminate on the basis of content or viewpoint, is narrowly drawn to serve an important governmental interest, and permits respondents to engage in a broad range of activity to express their views, including the solicitation of financial support. For these reasons, I agree with JUSTICE O'CONNOR that the Postal Service regulation is consistent with the protections of the First Amendment, and concur in the judgment of the Court.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join and with whom JUSTICE BLACKMUN joins as to Part I, dissenting.

Today the Court holds that a United States Postal Service regulation prohibiting persons from "[s]oliciting alms and contributions" on postal premises does not violate the First Amendment as applied to members of a political advocacy group who solicited contributions from a sidewalk outside the entrance to a post office. A plurality finds that the sidewalk is not a public forum and that the Postal Service regulation is valid because it is "reasonable." JUSTICE KENNEDY concludes that although the sidewalk might well be a public forum, the regulation is permissible as applied because it is a content-neutral time, place, or manner restriction on protected speech.

Neither of these conclusions is justified. I think it clear that the sidewalk in question is a "public forum" and that the Postal Service regulation does not qualify as a content-neutral time, place, or manner restriction. Moreover, even if I did not regard the sidewalk in question as a public forum, I could not subscribe to the plurality's position that respondents can validly be excluded from the sidewalk, because I believe that the distinction drawn by the postal regulation between solicitation and virtually all other kinds of speech is not a reasonable one. For these reasons, I respectfully dissent.

I

A

The plurality begins its analysis with the determination that the sidewalk in question is not a "public forum." See *ante*, at 727–728. Our decisions in recent years have identified three categories of forums in which expression might take place on government property: (1) traditional, "quintessential public forums"—"places which by long tradition or by government fiat have been devoted to assembly and debate,"

such as "streets and parks"; (2) "limited-purpose" or state-created semipublic forums opened "for use by the public as a place for expressive activity," such as university meeting facilities or school board meetings; and (3) nonpublic forums or public property "which is not by tradition or designation a forum for public communication." *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45–46 (1983); see also *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569, 572–573 (1987). Ironically, these public forum categories—originally conceived of as a way of *preserving* First Amendment rights, see Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1—have been used in some of our recent decisions as a means of upholding restrictions on speech. See, *e. g.*, *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260 (1988); *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.*, 473 U. S. 788 (1985); *United States* v. *Albertini*, 472 U. S. 675 (1985); *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984); *Minnesota State Bd. for Community Colleges* v. *Knight*, 465 U. S. 271 (1984); *Perry Education Assn.*, *supra*; *United States Postal Service* v. *Council of Greenburgh Civic Assns.*, 453 U. S. 114 (1981); but see *United States* v. *Grace*, 461 U. S. 171 (1983); *Widmar* v. *Vincent*, 454 U. S. 263 (1981). I have questioned whether public forum analysis, as the Court has employed it in recent cases, serves to obfuscate rather than clarify the issues at hand. See *Perry Education Assn.*, *supra*, at 62–63, n. 6 (dissenting opinion); *Council of Greenburgh Civic Assns.*, *supra*, at 136, 140 (opinion concurring in judgment); *Greer* v. *Spock*, 424 U. S. 828, 859–860 (1976) (dissenting opinion). Indeed, the Court's contemporary use of public forum doctrine has been roundly criticized by commentators.[1]

---

[1] See, *e. g.*, L. Tribe, American Constitutional Law 993 (2d ed. 1988) ("[A]n excessive focus on the public character of some forums, coupled with inadequate attention to the precise details of the restrictions on expres-

Today's decision confirms my doubts about the manner in which we have been using public forum analysis. Although the plurality recognizes that public sidewalks are, as a general matter, public forums, see *ante*, at 728, the plurality insists, with logic that is both strained and formalistic, that the specific sidewalk at issue is not a public forum. This conclusion is unsupportable. "[S]treets, sidewalks, and parks, are considered, without more, to be 'public forums.'" "Traditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." *United States* v. *Grace, supra*, at 177, 180. It is only common sense that a public sidewalk adjacent to a public building to which citizens are freely admitted is a natural location for speech to occur, whether that speech is critical of government generally, aimed at the particular governmental agency housed in the building, or focused upon issues unrelated to the gov-

---

sion, can leave speech inadequately protected in some cases, while unduly hampering state and local authorities in others") (footnotes omitted); Dienes, The Trashing of the Public Forum: Problems in First Amendment Analysis, 55 Geo. Wash. L. Rev. 109, 110 (1986) ("[C]onceptual approaches such as that embodied in the nonpublic-forum doctrine simply yield an inadequate jurisprudence of labels"); Farber & Nowak, The Misleading Nature of Public Forum Analysis: Content and Context in First Amendment Adjudication, 70 Va. L. Rev. 1219, 1234 (1984) ("Classification of public places as various types of forums has only confused judicial opinions by diverting attention from the real first amendment issues involved in the cases"); Post, Between Governance and Management: The History and Theory of the Public Forum, 34 UCLA L. Rev. 1713, 1715–1716 (1987) ("The doctrine has in fact become a serious obstacle not only to sensitive first amendment analysis, but also to a realistic appreciation of the government's requirements in controlling its own property. It has received nearly universal condemnation from commentators"); Stone, Content-Neutral Restrictions, 54 U. Chi. L. Rev. 46, 93 (1987) (current public forum analysis is plagued by a "myopic focus on formalistic labels" that "serves only to distract attention from the real stakes").

ernment. No doctrinal pigeonholing, complex formula, or multipart test can obscure this evident conclusion.

### 1

The plurality maintains that the postal sidewalk is not a traditional public forum because it "was constructed solely to provide for the passage of individuals engaged in postal business" and "leads only from the parking area to the front door of the post office." *Ante*, at 727. This reasoning is flawed.

Quintessential examples of a "public forum" are those open spaces — streets, parks, and sidewalks — to which the public generally has unconditional access and which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague* v. *Committee for Industrial Organizations*, 307 U. S. 496, 515 (1939) (opinion of Roberts, J.). Public parks, streets, and sidewalks are public forums because open access by all members of the public is integral to their function as central gathering places and arteries of transportation. Public access is not a matter of grace by government officials but rather is inherent in the open nature of the locations. As a result, expressive activity is compatible with the normal use of a public forum and can be accommodated simply by applying the communication-neutral rules used to regulate other, non-speech-related conduct on the premises. See *Grayned* v. *City of Rockford*, 408 U. S. 104, 116 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time"). For the most part, on streets and sidewalks, including the single-purpose sidewalk at issue here, communication between citizens can be permitted according to the principle that "one who is rightfully on a street which the state has left open to the public carries with him there as elsewhere the constitutional

right to express his views in an orderly fashion." *Jamison v. Texas*, 318 U. S. 413, 416 (1943).[2]

The wooden distinctions drawn today by the plurality have no basis in our prior cases and, furthermore, are in apparent contradiction to the plurality's admission that "[t]he mere physical characteristics of the property cannot dictate forum analysis." *Ante*, at 727. It is irrelevant that the sidewalk at issue may have been constructed only to provide access to the Bowie Post Office. Public sidewalks, parks, and streets have been reserved for public use as forums for speech even though government has not constructed them for expressive purposes. Parks are usually constructed to beautify a city and to provide opportunities for recreation, rather than to afford a forum for soapbox orators or leafleteers; streets are built to facilitate transportation, not to enable protesters to conduct marches; and sidewalks are created with pedestrians in mind, not solicitors. Hence, *why* the sidewalk was built is not salient.

Nor is it important that the sidewalk runs only between the parking lot and post office entrance. The existence of a public forum does not turn on a particularized factual inquiry into whether a sidewalk serves one building or many or whether a street is a dead end or a major thoroughfare. In *Boos v. Barry*, 485 U. S. 312 (1988), for example, JUSTICE O'CONNOR concluded that the public sidewalks within 500

---

[2] There may be important differences between cases in which citizens have a legal right to be present on government property and those in which "citizens claim a right to enter government property for the particular purpose of speaking." Laycock, Equal Access and Moments of Silence: The Equal Status of Religious Speech by Private Speakers, 81 Nw. U. L. Rev. 1, 48 (1986), cited in *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U. S. 569, 573 (1987). In the former class of cases—into which the instant case falls—the Court has recognized that when citizens are going about their business in a place they are entitled to be, they are presumptively entitled to speak. See *Jamison v. Texas*, 318 U. S., at 416; see also Post, *supra*, at 1717, 1765–1767, 1773–1775, 1781–1784.

feet of the embassies of the Governments of the Soviet Union and Nicaragua in Washington, D. C. are public forums without considering the factors found in today's opinion. See *id.*, at 318. In *Frisby* v. *Schultz*, 487 U. S. 474 (1988), JUSTICE O'CONNOR acknowledged that "'time out of mind' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Id.*, at 480 (citation omitted). She explained that "our decisions identifying public streets and sidewalks as traditional public fora are not accidental invocations of a 'cliché' but recognition that '[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public.' *No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora.*" *Id.*, at 480–481 (emphasis added; citations omitted). JUSTICE O'CONNOR further wrote that "a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood" or because it is "physical[ly] narro[w]." *Id.*, at 480.

The architectural idiosyncrasies of the Bowie Post Office are thus not determinative of the question whether the public area around it constitutes a public forum. Rather, that the walkway at issue is a sidewalk open and accessible to the general public is alone sufficient to identify it as a public forum. As the Court of Appeals observed: "It ill behooves us to undertake too intricate a task of designation, holding this sidewalk public and that one not. . . . [S]uch labeling loses sight of the fact that most sidewalks are designed as outdoor public thoroughfares and that citizens should not be left to wonder at which ones they will be permitted to speak and which ones not." 866 F. 2d 699, 702 (CA4 1989).[3]

---

[3] To its credit, the plurality does not rely—as a ground for finding that the sidewalk at issue is not a public forum—on the fact that at the Bowie

The cases that formed the foundation of public forum doctrine did not engage in the type of fact-specific inquiry undertaken by the plurality today. In *Cox* v. *Louisiana*, 379 U. S. 536, 553–558 (1965), for example, we reversed a civil rights leader's conviction for obstructing a public passage after he organized a protest on a municipal sidewalk across the street from the Baton Rouge courthouse. We did not consider whether the sidewalk was constructed to facilitate protests (an unlikely possibility), or whether the sidewalk was a "public thoroughfare" rather than one providing access to only a limited number of locations. Similarly, in *Edwards* v. *South Carolina*, 372 U. S. 229 (1963), we reversed the convictions of civil rights demonstrators who had assembled on the grounds of the South Carolina State House, "an area of two city blocks open to the general public," *id.*, at 230, without inquiring whether the State had dedicated the statehouse grounds for such expressive activities. In *Shuttlesworth* v. *Birmingham*, 394 U. S. 147, 152 (1969), we did not suggest that our constitutional analysis hinged on whether the sidewalk march had occurred on Main Street or on a dead-end street leading only to a single public building. See also *Carey* v. *Brown*, 447 U. S. 455, 460 (1980); *Grayned* v. *City of Rockford*, 408 U. S. 104, 120–121 (1972); *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972).

Whatever the proper application of public forum doctrine to novel situations like fundraising drives in the federal workplace, see *Cornelius* v. *NAACP Legal Defense & Edu-*

---

Post Office a parking lot separates the sidewalk from a nearby highway. The Court of Appeals supplied the ready answer to such an argument:

"If 'the mere presence of a parking area between the street and a sidewalk limits our scrutiny of speech-related regulations to the standard for nonpublic fora, we issue an open invitation for government architects and landscapers to surround public buildings with modern-day moats.' The First Amendment is not consigned to the mercies of architectural chicanery, nor may a federal agency, simply by designating a sidewalk its own, spare itself the inconvenience of political protest and speech." 866 F. 2d, at 703 (citation omitted).

*cational Fund, Inc.*, 473 U. S. 788 (1985), or the internal mail systems of public schools, see *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37 (1983), we ought not unreflectively transfer principles of analysis developed in those specialized and difficult contexts to traditional forums such as streets, sidewalks, and parks.[4]  See n. 2, *supra*.  In

---

[4] This is not a case involving the Government's " 'discretion and control over the management of its personnel and internal affairs.' "  *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.*, 473 U. S. 788, 805 (1985), quoting *Arnett* v. *Kennedy*, 416 U. S. 134, 168 (1974) (Powell, J., concurring in part); see also *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 896 (1961) (upholding authority of the commander of a military base to deny employment to a civilian cook without a hearing on the basis of security concerns).  The instant case involves activities of ordinary citizens *outside* the post office, not the conduct of postal employees. I reject the plurality's implication that the "proprietary" nature of the post office somehow detracts from the *sidewalk's* status as a public forum. *Ante*, at 725.  "[T]he government may not escape the reach of the First Amendment by asserting that it acts only in a *proprietary* capacity with respect to streets and parks."  *Smith* v. *Goguen*, 415 U. S. 566, 594 (1974) (REHNQUIST, J., dissenting) (emphasis added).  The sidewalk or street outside the White House is no different from one outside a post office or one outside a private store—despite the differences in what transpires inside.  The plurality's statement that "[t]he purpose of the forum in this case is to accomplish the most efficient and effective postal delivery system," *ante*, at 732, confuses the sidewalk with the interior of the post office.

Furthermore, I would be wary of placing so much weight on the blurry concept of government *qua* "proprietor."  See *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 539–547 (1985); *Owen* v. *City of Independence*, 445 U. S. 622, 644–647 (1980).  Certainly, the mere fact that postal operations are somehow *implicated* here cannot give the Government greater license to silence citizens in a public forum.  Cf. *Rutan* v. *Republican Party of Illinois*, *ante*, at 70–71, n. 4.  The fact that the government is acting as an employer or as a proprietor does not exempt it from the distinct requirements of the Equal Protection Clause, see, *e. g.*, *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 723–724 (1982); *Sugarman* v. *Dougall*, 413 U. S. 634, 641, 648–649 (1973); *Turner* v. *City of Memphis*, 369 U. S. 350, 353 (1962) *(per curiam)*, or the Due Process Clause, *Cleveland Bd. of Education* v. *Loudermill*, 470 U. S. 532, 538–545 (1985); *Perry* v. *Sindermann*, 408 U. S. 593, 599–603 (1972), or the Com-

doing so, the plurality dilutes the very core of the public forum doctrine. As JUSTICE KENNEDY notes, "the demand for recognition of heightened First Amendment protection has more force here than in those instances where the Government created a nontraditional forum to accommodate speech for a special purpose, as was thought true with teachers' mailboxes in *Perry Education Assn. [,supra]*, or the Combined Federal Campaign in *Cornelius.*" *Ante*, at 738 (opinion concurring in judgment). We have never applied a "reasonableness" test to speech in a place where government property was open to the public.[5] Indeed, even in regulated

merce Clause, see *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82, 87 (1984), or the Privileges and Immunities Clause of Article IV. See *United Building & Construction Trades Council of Camden County* v. *Mayor and Council of Camden*, 465 U. S. 208, 214–218 (1984).

The plurality's reliance on *Lehman* v. *City of Shaker Heights*, 418 U. S. 298 (1974) (plurality opinion), is also misplaced. That a city may protect a captive audience in the small, enclosed space of a municipal bus says little about the type of regulations that the Government may adopt in the context of an outdoor public sidewalk. Justice Douglas, who provided the fifth vote in *Lehman* in his opinion concurring in the judgment, saw a clear distinction between the two situations. "One who hears disquieting or unpleasant programs in public places, such as restaurants, can get up and leave. But the man on the streetcar has no choice but to sit and listen, or perhaps to sit and to try *not* to listen." *Public Utilities Comm'n of District of Columbia* v. *Pollak*, 343 U. S. 451, 469 (1952) (Douglas, J., dissenting). Although the Government, within certain limits, may protect captive listeners against unwelcome intrusions, in public locations "we expect individuals simply to avoid speech they do not want to hear." *Frisby* v. *Schultz*, 487 U. S. 474, 484 (1988); cf. *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, 210–211 (1975); *Cohen* v. *California*, 403 U. S. 15, 21–22 (1971).

[5] *Greer* v. *Spock*, 424 U. S. 828 (1976), is readily distinguishable because the Court in that case held, over my dissent, that a sidewalk on a *military base* was not truly "open" to the public and was therefore not a public forum. The Court reasoned that although the public was freely permitted to visit the base, the commanding officer's authority to exclude not only those engaged in expressive activity, but *anyone* deemed by him to be detrimental to the defense function, was "unquestioned." *Id.*, at 838. Cf. *Flower* v. *United States*, 407 U. S. 197, 198 (1972) *(per curiam)* (re-

environments where a public right of access nevertheless exists, we have applied a higher level of scrutiny to restrictions on speech than the plurality does today. See *Cohen* v. *California*, 403 U. S. 15, 22 (1971); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 509 (1969).

2

Even if I did not believe that the postal sidewalk is a "traditional" public forum within the meaning of our cases, I would find that it is a "limited-purpose" forum from which respondents may not be excluded absent a showing of a compelling interest to which any exclusion is narrowly tailored. We have recognized that even where a forum would not exist but for the decision of government to create it, the government's power to enforce exclusions from the forum is narrowly circumscribed if the government permits a wide range of expression to occur. See *Perry Education Assn.*, 460 U. S., at 45; see also *Widmar* v. *Vincent*, 454 U. S. 263, 267–268 (1981); *Madison Joint School Dist. No. 8* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167, 175–176 (1976); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S.

versing conviction for distributing leaflets on a military base where the "fort commander chose not to exclude the public from the street where petitioner was arrested" and where " 'there [wa]s no sentry post or guard at either entrance or anywhere along the route' " and " '[t]raffic flow[ed] through the post on this and other streets 24 hours a day' ") (citation omitted). Of course, I disagreed with the majority's assessment of the facts in *Greer*, as the plurality today points out. See *ante*, at 729. But that the Court in *Greer* engaged in a debate over the degree to which the sidewalk was open to the public demonstrates that the Court believed that a sidewalk generally accessible to the public—as in the instant case—is a public forum. At any rate, I do not believe that our decision in *Greer*, colored as it was by the special security concerns of a military base, see 424 U. S., at 837 ("[T]his Court over the years has on countless occasions recognized the special constitutional function of the military in our national life, a function both explicit and indispensable"); see also *Brown* v. *Glines*, 444 U. S. 348, 353–354 (1980) (discussing *Greer*), is helpful in identifying public forums outside the unique context of the military.

546, 555–558 (1975). In a limited-purpose forum, "the Government must permit wider access to the forum than it has otherwise intended." *Ante,* at 738 (KENNEDY, J., concurring in judgment).

The plurality acknowledges both that "the forum here has been dedicated to some First Amendment uses and thus is *not* a purely nonpublic forum," *ante,* at 730 (emphasis added), and that "the Service's generous accommodation of some types of speech testifies to its willingness to provide as broad a forum as possible, consistent with its postal mission." *Ante,* at 733. These observations support a finding that the sidewalk is a limited-purpose forum, especially in light of the wide range of expressive activities that are permitted. The postal regulation forbids persons only from "[s]oliciting alms and contributions, campaigning for election to any public office, collecting private debts, commercial soliciting and vending, and displaying or distributing commercial advertising on postal premises." 39 CFR § 232.1(h)(1) (1989). The Government thus invites labor picketing, soapbox oratory, distributing literature, holding political rallies, playing music, circulating petitions, or any other form of speech not specifically mentioned in the regulation.

The plurality concludes that the sidewalk is not a limited-purpose forum only by ignoring its earlier observations. The plurality maintains that "a practice of allowing some speech activities on postal property do[es] not add up to the dedication of postal property to speech activities," *ante,* at 730, and concludes that the Postal Service may close off postal premises to solicitors even though it has opened the forum to virtually every other type of speech. The plurality's conclusion is unsound.

The plurality has collapsed the distinction between exclusions that help define the contours of the forum and those that are imposed *after* the forum is defined. Because the plurality finds that the prohibition on solicitation is part of the definition of the forum, it does not view the regulation as

operating on a public forum and hence subjects the postal regulation to only a "reasonableness" inquiry. If, however, the ban on solicitation were found to be an independent restriction on speech occurring in a limited public forum, it would be judged according to stricter scrutiny. See *Perry Education Assn.*, *supra*, at 45–46. The plurality's approach highlights the fact that there is only a semantic distinction between the two ways in which exclusions from a limited-purpose forum can be characterized, although the two options carry with them different standards of review. The plurality's logic, as JUSTICE BLACKMUN has noted in a previous case, would make restrictions on access to limited public forums self-justifying:

> "The Court makes it *virtually* impossible to prove that a forum restricted to a particular class of speakers is a limited public forum. If the Government does not create a limited public forum unless it intends to provide an 'open forum' for expressive activity, and if the exclusion of some speakers is evidence that the Government did not intend to create such a forum, . . . no speaker challenging denial of access will ever be able to prove that the forum is a limited public forum. The very fact that the Government denied access to the speaker indicates that the Government did not intend to provide an open forum for expressive activity, and under the Court's analysis that fact alone would demonstrate that the forum is not a limited public forum." *Cornelius*, 473 U. S., at 825 (dissenting opinion).

The plurality does not, and cannot, explain in the instant case why the postal regulation establishes a policy of "'[s]elective access,'" *ante*, at 730 (citation omitted), rather than constituting a separate restriction on speech in a limited public forum. Nor can the plurality explain how its reasoning is consistent with our past cases. In *Carey* v. *Brown*, 447 U. S. 455, 460 (1980), *Grayned* v. *Rockford*, 408 U. S., at 107, and *Police Department of Chicago* v. *Mosley*, 408 U. S.,

at 96, for example, we held that bans on picketing were invalid because they contained impermissible exemptions for labor picketing. We did not hold, as the plurality's position might suggest, that the bans were valid because the labor exemption was part of the forum's definition. Similarly, the restrictions at issue in *Southeastern Promotions, Ltd.* v. *Conrad, supra,* at 549, n. 4, and *Widmar* v. *Vincent,* 454 U. S. 263, 265–266, n. 3 (1981), could have been—but were not—used to show that the municipal theater and university meeting rooms, respectively, were not public forums because they practiced a policy of selective access.[6]

I would find that the postal sidewalk is a public forum, either of the "traditional" or "limited-purpose" variety.

## B

Content-based restrictions on speech occurring in either a public forum or in a limited-purpose public forum are invalid unless they are narrowly drawn to serve a compelling interest. See *Perry Education Assn.,* 460 U. S., at 45. Government "may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Ibid.* I do not think the postal regulation can pass muster under either standard. Although I agree that the Govern-

---

[6] I am encouraged by the apparent fact that a majority of the Court does not adhere to the plurality's reasoning on this point. JUSTICE KENNEDY's citation to JUSTICE BLACKMUN's *Cornelius* dissent, see *ante,* at 738 (opinion concurring in judgment), citing *Cornelius,* 473 U. S., at 819–820, suggests that JUSTICE KENNEDY believes that access depends upon "the nature of the forum and the nature of the expressive activity" and whether "the activity [would be] compatible with normal uses of the property," *id.,* at 820, not upon whether the government explicitly permits access. See *ante,* at 737–738 ("If our public forum jurisprudence is to retain vitality, we must recognize that certain objective characteristics of Government property and its customary use by the public may control the case") (KENNEDY, J., concurring in judgment).

ment has an interest in preventing the obstruction of post office entrances and the disruption of postal functions, there is no indication that respondents interfered with postal business in any way. The Court of Appeals found:

> "The record in this case reveals no evidence of a significant government interest best served by the ban on solicitation in a public forum. There is no evidence that Kokinda and Pearl's solicitation obstructed or impeded postal customers. [Respondents] were not charged with obstructing post office entrances, disturbing postal employees in the performance of their duties, or impeding the public in the transaction of postal business. There is nothing to suggest that they harassed, threatened, or physically detained unwilling listeners." 866 F. 2d, at 704 (citation omitted).

I agree with the Court of Appeals that the postal regulation is invalid as applied in this case because it "prohibits all solicitation anywhere on postal service property. It sweeps an entire category of expressive activity off a public forum solely in the interest of administrative convenience. It does not attempt to limit nondisruptive solicitation to a time, place, and manner consistent with post office operations; and it does not require that evidence of disruption be shown." *Id.*, at 705–706.

JUSTICE KENNEDY contends that the postal regulation may be upheld as a content-neutral time, place, or manner regulation. But the regulation is not content neutral; indeed, it is tied explicitly to the content of speech. If a person on postal premises says to members of the public, "Please support my political advocacy group," he cannot be punished. If he says, "Please contribute $10," he is subject to criminal prosecution. His punishment depends entirely on what he says.

The plurality suggests that the regulation is not based on the content of speech, regardless of the terms of the restric-

tion, because the proffered governmental *interest* is unrelated to the communicative impact of expression. See *ante,* at 736 (discussing "[t]he Service's concern about losing customers because of the potentially unpleasant situation created by solicitation"). This reasoning is flawed. Any restriction on speech, the application of which turns on the substance of the speech, is content based no matter what the Government's interest may be. See *Boos,* 485 U. S., at 335–338 (BRENNAN, J., concurring in part and concurring in judgment). In any event, the Government interest in this case is related to the suppression of expression because the evil at which the postal regulation is aimed—by the admission of both the Postal Service, see 43 Fed. Reg. 38824 (1978), and the plurality, see *ante,* at 736—is the danger that solicitors might annoy postal customers and discourage them from patronizing postal offices. But solicitors do not purportedly irk customers by speaking unusually loudly or uncomfortably close to their subjects. Rather, the fear is that solicitation is bothersome because of its *content:* The post office is concerned that being asked for money may be embarrassing or annoying to some people, particularly when the speaker is a member of a disfavored or unpopular political advocacy group. For example, the Government makes much of the 40 or 50 customer complaints received at the Bowie Post Office while respondents solicited the public. See Brief for United States 35–36, and n. 11. But the record does not demonstrate that the complaints related to any difficulty in obtaining access to the post office. "For all we know, the complaints may have been generated by the hearers' disagreement with the message of the National Democratic Policy Committee or their disapproval of the appearance or affiliation of the speakers." 866 F. 2d, at 705. Although the Service's paternalism may be well intended, it is axiomatic that a listener's reaction to speech is not a content-neutral basis for regulation. Cf. *United States* v. *Eichman,* 496 U. S. 310, 315–318 (1990); *Texas* v. *Johnson,* 491 U. S. 397,

408–410 (1989). Speech is not subject to regulation "'simply because it may embarrass others or coerce them into action.'" *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 55 (1988), quoting *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 910 (1982).

In addition, the postal regulation is not a permissible time, place, or manner rule because its prohibition on solicitation is absolute and not "narrowly tailored," *Perry Education Assn.*, 460 U. S., at 45, to the Government's interest in avoiding disruption. Rather, the regulation is based on the Postal Service's generalized judgment that solicitation is more likely to be disruptive than are other types of speech. The postal regulation is a "time, place, or manner" rule only in the novel sense that it permits no *manner* of solicitation at any *time* or at any *place* in the forum.[7] It is conceivable that in some instances solicitation might cause a crowd to form and block a post office entrance because an individual who decides to respond must "reach for a wallet, search it for money, write a check, or produce a credit card," *ante*, at 734, but the Postal Service has failed to document that this in fact has *ever* occurred, let alone that it would be more than an occasional problem. The record in the instant case demonstrates that solicitation certainly does not invariably disrupt postal functions. The plurality's trumpeting of Postal Service "real-world experience" as a valid basis for the regulation, *ante*, at 735, is entirely unjustified, given that the Service's

---

[7] JUSTICE KENNEDY's suggestion, *ante*, at 738–739 (opinion concurring in judgment), that respondents could distribute literature asking for financial support—perhaps requesting that contributions be mailed to a particular address—is unhelpful because JUSTICE KENNEDY has simply identified another way that respondents could raise funds short of solicitation. Such an alternative is indeed open to respondents, but in choosing it they would forfeit the unique advantages of in-person solicitation recognized by JUSTICE O'CONNOR: "In a face-to-face encounter there is a greater opportunity for the exchange of ideas and the propagation of views than is available [through written] literature [that is] merely informative." *Cornelius*, 473 U. S., at 798.

experience is limited to solicitation *in postal lobbies*. The Postal Service has never found solicitation on *exterior* sidewalks to pose a danger to postal operations.[8]

When government seeks to prohibit categorically an entire class of expression, it bears, at the very least, a heavy burden of justification. See *Schad* v. *Mount Ephraim*, 452 U. S. 61, 67, 72–74 (1981) (the "exclusion of a broad category

---

[8] The Postal Service explained when it promulgated its regulations that:

"Since the act of soliciting alms or contributions usually has as its objective an immediate act of charity, it has the potentiality for evoking highly personal and subjective reactions. Reflection usually is not encouraged, and the person solicited often must make a hasty decision whether to share his resources with an unfamiliar organization while under the eager gaze of the solicitor. Such confrontations, *if occurring in the confines of a small post office lobby, at a post office writing desk or service window, or in a queue at a service window*—places from which the individual cannot escape if he or she wishes to transact postal business—would be likely to produce hostile reactions and to cause people to avoid post offices." 43 Fed. Reg. 38824 (1978) (emphasis added).

The concern expressed was limited to solicitation *inside* postal lobbies. See *ibid.* ("The use of *lobby space* for such activity has been highly unsatisfactory") (emphasis added); see also *United States* v. *Bjerke*, 796 F. 2d 643, 650 (CA3 1986). The fact that "most post office lobbies . . . are too small to accommodate nonpostal public activities without disturbing postal employees in the performance of their duties and impeding the public in transacting postal business," 42 Fed. Reg. 63911 (1977); see also 43 Fed. Reg. 38824 (1978), says nothing about the sidewalks outside. The confined space of a lobby may well warrant measures that are not permissible elsewhere.

I do not think it appropriate to imagine for ourselves the possible ways in which solicitation on outside sidewalks might be disruptive. The Postal Service, the agency with "long experience" in this regard, *ante*, at 735, has been silent on the matter, except insofar as the Government has attempted to present *post hoc* rationalizations for the regulation long after its promulgation. See *ibid.* (citing Tr. of Oral Arg. 9). By analogy, were this a straightforward administrative law case, the failure of the Postal Service to document any danger of disruption from solicitation on outside sidewalks would be the end of the matter. See *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 653–654 (1990); *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 419 (1971); *SEC* v. *Chenery Corp.*, 318 U. S. 80, 87 (1943).

of protected expression" demands heightened scrutiny and evidence supporting the need for complete exclusion).[9]  I find that the Postal Service has not met this burden and that the postal regulation prohibiting an entire category of expression based on a broad assessment of its likely effects cannot qualify as a valid time, place, or manner regulation because such a prohibition "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Ward* v. *Rock Against Racism*, 491 U. S. 781, 799 (1989).  "'A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil.'" *Id.*, at 800, quoting *Frisby*, 487 U. S., at 485.  In other contexts we have stressed that problems associated with solicitation must be addressed through "measures less intrusive than a direct prohibition on solicitation." *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 637 (1980); see also *Riley* v. *National Federation of Blind of North Carolina, Inc.*, 487 U. S. 781, 795 (1988).  Thus, in *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640 (1981), we upheld as a valid time, place, or manner regulation a rule requiring that solicitation in a public fairground take place only at assigned booths.  We rejected the claim that the rule was a "total ban" because we found that it permitted groups "to solicit funds and distribute and sell literature from within the fairgrounds, albeit from a fixed location." *Id.*, at 655, n. 16. The postal regulation, by contrast, prohibits solicitation altogether.

---

[9] Indeed, we have noted that "[i]n a public forum, by definition, *all* parties have a constitutional right of access and the State must demonstrate compelling reasons for restricting access to *a single class of speakers*, a single viewpoint, or a single subject." *Perry Education Assn.*, 460 U. S., at 55 (emphasis added).  Thus, in *United States* v. *Grace*, 461 U. S. 171, 177 (1983), we contrasted "time, place, and manner regulations" with "[a]dditional restrictions such as an absolute prohibition on a particular type of expression."  The latter, we said, "will be upheld only if narrowly drawn to accomplish a compelling governmental interest." *Ibid.*

In short, the Postal Service has made no attempt to justify its complete exclusion of solicitation from all locations on postal property, including exterior sidewalks. The plurality's conclusion that a complete ban on solicitation is warranted rests on speculation regarding the possibility of disruption that is both inappropriate and unsupported. As I have commented previously, "[n]o doubt a plausible argument could be made that the political gatherings of some parties are more likely than others to attract large crowds causing congestion, that picketing for certain causes is more likely than other picketing to cause visual clutter, or that speakers delivering a particular message are more likely than others to attract an unruly audience. . . . [But] governments [must] regulate based on actual congestion, visual clutter, or violence rather than based on predictions that speech with a certain content will induce these effects." *Boos* v. *Barry*, 485 U. S., at 335 (opinion concurring in part and concurring in judgment). The First Amendment demands that the Postal Service prohibit solicitation only when it actually threatens legitimate government interests; "[b]road prophylactic rules in the area of free expression are suspect. . . . Precision of regulation must be the touchstone." *NAACP* v. *Button*, 371 U. S. 415, 438 (1963).

Indeed, a great irony of this case is that the Postal Service has already promulgated legitimate time, place, and manner regulations that fully protect its interests in preventing disruption of postal operations. The postal regulations governing conduct on postal premises are codified in Part 232 of the Code of Federal Regulations (Conduct on Postal Property). Postal Service rules prohibit individuals from obstructing post office entrances, disturbing postal employees in the performance of their duties, or impeding the public in the transaction of postal business. Section 232.1(e), for example, provides that:

> "Disorderly conduct, or conduct which creates loud and unusual noise, or which obstructs the usual use of en-

trances, foyers, corridors, offices, elevators, stairways, and parking lots, or which otherwise tends to impede or disturb the public employees in the performance of their duties, or which otherwise impedes or disturbs the general public in transacting business or obtaining the services provided on property, is prohibited." 39 CFR § 232.1(e) (1989).

Similarly, § 232.1(k)(2) forbids "[t]he blocking of entrances, driveways, walks, loading platforms, or fire hydrants in or on [postal] property." See also § 232.1(c) (prohibition on "creating any hazard to persons or things"). Thus, although the postal regulation at issue here—§ 232.1(h)(1)—bans solicitation altogether, postal regulations restrict other forms of expression only when they actually disrupt postal operations. There is no reason why the rules prohibiting disruptive conduct cannot be used to address the governmental interest in this case, and hence there is no need for a categorical exclusion of solicitation from sidewalks on postal property.

## II

Even if I did not believe that the sidewalk outside the Bowie Post Office was a public forum, I nevertheless could not agree with the plurality that the postal regulation at issue today is reasonable as applied to respondents. The Postal Service does not subject to the same categorical prohibition many other types of speech presenting the same risk of disruption as solicitation, such as soapbox oratory, pamphleteering, distributing literature for free, or even flag burning.[10] A solicitor who asks for funds and offers literature for sale outside the entrance to a post office is no more likely to block access than is a leafleteer who stands in the same place or a speaker who sets up his soapbox there. In fact, solicitors

---

[10] I note that one of the prosecutions at issue in *United States* v. *Eichman*, 496 U. S. 310 (1990), involved a flag burning that occurred on a sidewalk in front of a post office. See *United States* v. *Haggerty*, 731 F. Supp. 415, 416 (WD Wash. 1990).

may be quite unlikely to attract much of an audience, because public requests for money are often ignored. Certainly, solicitors are less likely to draw a crowd, and thus to disrupt postal functions, than are eloquent orators or persons distributing popular magazines for free. Under the regulation, a group may stage a political rally to call attention to the problem of drug abuse [11] and draw hundreds or even thousands of persons to the area just outside the entrance to the post office, because there is no general prohibition on large gatherings on postal premises. [12] But since there *is* a categorical ban on solicitation, the group would be unable to ask a single member of the public for a contribution to advance its cause.

This inconsistent treatment renders the prohibition on solicitation unreasonable. The Postal Service undeniably has a legitimate interest in avoiding disruption of its postal facilities and ensuring that its buildings remain accessible to the public. But the Government interest in preventing disruption of post office business or harassment of postal patrons is addressed by the direct prohibitions on such conduct in existing postal rules, see *supra*, at 758–759, and the Service has not explained satisfactorily why these provisions are inadequate to deal with any disruption caused by solicitation.

The plurality suggests that the irksome nature of solicitation supports the reasonableness of the postal regulation. Even were the Postal Service's desire to prevent the annoyance of customers a legitimate basis for regulation, [13] such an

---

[11] The regulation subjects to a categorical ban only "campaigning for election to any public office." 39 CFR § 232.1(h)(1) (1989). A rally concerning a particular issue rather than a candidate is not covered.

[12] The organizers of such a rally might well be prosecuted for obstructing the entrance of the post office under § 232.1(e) or § 232.1(k)(2) if the gathering in fact caused a disruption. But that is precisely the point: *Other* regulations, *not* § 232.1(h)(1), protect the Postal Service's asserted interest.

[13] The Postal Service's desire to protect customers from speech with which they might disagree would not be a valid basis for regulation even were the sidewalk a nonpublic forum. While we have held that speech in a nonpublic forum may be regulated so as to prevent disruption of the forum,

interest could not justify the blanket ban on solicitation alone. Many expressive activities permitted by § 232.1(h)(1) likely would trigger the same reactions in the audience. Pamphleteers might distribute embarrassing or disturbing handbills, and soapbox orators might shout caustic invectives at postal patrons as they walk past, yet those activities are not subject to a categorical prohibition. Indeed, the Postal Service permits other types of speech that demand an immediate response from the listener, such as inviting passersby to sign a petition to place an initiative proposal on the ballot. See *Meyer* v. *Grant*, 486 U. S. 414 (1988). The notion that solicitation is "inherently" more invasive of the public's peace of mind is untenable.

The Government contends that any attempt to regulate solicitation on a case-by-case basis according to the general "disruption" regulation would be "unadministrable" because the Service "lacks the resources to enforce such regulation in the tens of thousands of post offices throughout the nation." 43 Fed. Reg. 38824 (1978). But the Government's interest in bright-line rules is hardly creditable, given that the Postal Service has chosen to adopt categorical restrictions on speech only with respect to solicitation. If such application of the general disturbance and obstruction rules contained in §§ 232.1(e) and 232.1(k)(2) is "administrable" with respect to other types of speech, I fail to understand how a case-by-case inquiry suddenly becomes impracticable in the context of solicitation.[14]

---

see *Cornelius*, 473 U. S., at 811, a restriction cannot be premised on the mere fact that some members of the public might disapprove of a speaker's message or means of delivery. Such expression "is still protected speech even in a nonpublic forum." *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S., at 576.

[14] The Postal Service has decided to require local postmasters to make case-by-case assessments regarding a whole range of expression and other conduct on postal premises, belying the Government's claim that such an approach would be "unadministrable" with respect to solicitation. Postal regulations provide, for example, that photographs "for news . . . pur-

Moreover, even were the Postal Service's administrability concerns real, the Service could quite easily design categorical rules governing solicitation that would both obviate the need for administrative discretion and yet fall far short of a total ban. The Service could formulate, for example, reasonable restrictions on the size and placement of tables, on solicitation during peak postal hours, on the use of parking spaces by nonpostal customers, or on the number of persons who may engage in solicitation at the same time and place. Although the Government would not be required to choose the least restrictive alternative were the plurality correct in its view that the sidewalk is a nonpublic forum, these other ap-

poses" may be taken "in entrances, lobbies, foyers, corridors, or auditoriums when used for public meetings." 39 CFR § 232.1(i) (1989). Local postmasters obviously must decide on a case-by-case basis how to cope with the disruption posed by camera equipment, cables, and the presence of news media personnel. Moreover, the regulation explicitly vests discretion in local post office officials with respect to photographs for other than news purposes: "Other photographs may be taken only with the permission of the local postmaster or installation head." Similarly, § 232.1(o) grants local officials discretion to make case-by-case judgments concerning the appropriateness of displaying community notices and other materials of public interest on postal bulletin boards:

"The Postal Service has no intention to discontinue . . . that valuable service [of providing a place for the display of public notices and announcements] to local communities. The adopted regulation contains, as did the proposed rule, language insuring that the authority of postmasters to allow the placement in post offices of bulletin boards for the display of public notices and announcements, will continue as before. Thus, both [§ 232.1(h) (1)(ii) and § 232.1(o)(1)] contain language excepting from their coverage, 'posting notices on bulletin boards as authorized in § 243.2(a) of this chapter.'

"The reference[d] section authorizes both public and employee bulletin boards. Postmasters are not required to provide bulletin board space for nongovernmental public announcements; but they are encouraged by postal policy to provide such space for the display of notices of public assemblies and judicial sales, official election notices issued by State or local government, and similar announcements so long as there is sufficient space for the effective display of scheduled postal materials and other Federal Government notices." 43 Fed. Reg. 38824–38825 (1978).

proaches to the problem of disruption are so obvious that the no-solicitation regulation can scarcely be considered a reasonable way of addressing the Service's asserted interest in avoiding case-by-case determinations.

### III

Some postal patrons may thank the Court for sparing them the inconvenience of having to encounter solicitors with whose views they do not agree. And postal officials can rest assured in the knowledge that they can silence an entire category of expression without having to apply the existing postal regulations governing disruptive conduct or having to craft more narrow time, place, or manner rules. Perhaps only three groups of people will be saddened by today's decision. The first includes solicitors, who, in a farce of the public forum doctrine, will henceforth be permitted at postal locations to solicit the public only from such inhospitable locations as the busy four-lane highway that runs in front of the Bowie Post Office. The next to be disappointed will be those members of the public who would prefer not to be deprived of the views of solicitors at postal locations. The last group, unfortunately, includes all of us who are conscious of the importance of the First Amendment.

I respectfully dissent.