COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton, Willis, Elder,
          Bray, Annunziata, Bumgardner, Frank, Humphreys, Clements
          and Agee
Argued at Richmond, Virginia


KEVIN LAMONT HICKS
                                            OPINION BY
v.    Record No. 1895-99-2    CHIEF JUDGE JOHANNA L. FITZPATRICK
                                            JULY 3, 2001
COMMONWEALTH OF VIRGINIA


                    UPON A REHEARING EN BANC

         FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    Thomas N. Nance, Judge

         Steven D. Benjamin (Betty Layne DesPortes;
         Benjamin & DesPortes, P.C., on briefs), for
         appellant.

         Virginia B. Theisen, Assistant Attorney
         General (Mark L. Earley, Attorney General, on
         brief), for appellee.

         Amicus Curiae:  American Civil Liberties
         Union of Virginia Foundation, Inc.
         (Rebecca K. Glenberg, on brief), for
         appellant.


     On October 17, 2000, a panel of this Court affirmed the

trespass conviction of Kevin Lamont Hicks (appellant).  See

Hicks v. Commonwealth, 33 Va. App. 561, 535 S.E.2d 678 (2000).

Appellant's petition for rehearing en banc was granted and the

mandate of the October 17, 2000 opinion was stayed.  See Hicks

v. Commonwealth, 34 Va. App. 42, 537 S.E.2d 616 (2000).

Appellant contends the trial court erred in (1) denying his

motion to dismiss the prosecution on the grounds that the barment-trespass procedure violated his First and Fourteenth Amendment rights and (2) denying his motion to remand the case to the general district court for trial before a different judge of that court and require the Commonwealth's attorney to prosecute the case.  Upon rehearing en banc, we hold that the barment-trespass procedure employed by the City of Richmond in the instant case violates the First and Fourteenth Amendments to the United States Constitution and, thus, we reverse and dismiss the trial court's conviction of appellant.  The mandate of the October 17, 2000 opinion is hereby vacated.

                              I.

    Whitcomb Court is a housing project owned by the Richmond Redevelopment and Housing Authority (RRHA).  RRHA sought to "privatize" the streets surrounding and adjacent to the Whitcomb Court housing project in an effort to make the community safer.[1]

---

[1] RRHA issued a brochure to the residents explaining the goals of street privatization:

> To make communities safer by removing
> persons who commit unlawful acts which
> destroy the peaceful enjoyment of other
> residents
> To ensure that children have places to play
> free of drug paraphernalia and the danger of
> gunshots and other criminal activity.
> To provide an opportunity for residents to
> develop safety initiatives in their
> community, such as resident patrols, social
> security number property identification,
> neighborhood watch, etc.

On June 23, 1997 the City of Richmond adopted ordinance No. 97-181-197 deeding the streets surrounding Whitcomb Court to RRHA.  The ordinance provided:

> § 1.  That Carmine Street, Bethel Street, Ambrose Street, Deforrest Street, the 2100-2300 Block of Sussex Street and the 2700-2800 Block of Magnolia Street in Whitcomb Court . . . be and are hereby closed to public use and travel and abandoned as streets of the City of Richmond.
>
> \*       \*       \*       \*       \*       \*       \*
>
> § 3.  The City shall retain a full width utility easement in the streets proposed to be closed by this ordinance . . . .
> § 4.  The City shall retain a full width right of way maintenance easement in the streets proposed to be closed by this ordinance.
> § 5.  That the aforesaid streets shall be designated as public highways for law enforcement purposes . . . .

The streets deeded to Whitcomb Court at issue here were those streets surrounding and adjacent to the property owned by RRHA, not those contained within Whitcomb Court.  Prior to "privatization," these streets were similar to all other streets in Richmond.  After the streets were deeded to RRHA, red and white "private property, no trespass" signs were posted throughout Whitcomb Court and every "hundred feet on each block," informing the public that "these streets are privatized

---

To hold households who knowingly harbor persons who engage in criminal activity accountable.

and all the property is privatized, no trespass."  The signs were "approximately 18 inches to almost 24 inches by about 12 inches."  However, the streets were not gated, barricaded, or otherwise closed or restricted only to Whitcomb Court traffic. The streets remained open to vehicular traffic, and the sidewalks were open to access by the public.

After the streets were deeded to RRHA, RRHA adopted a barment-trespass procedure to prevent any "unauthorized persons" from entering the property.  On November 13, 1998 the RRHA's Director of Housing Operations authorized

> each and every sworn officer of the Richmond
> Police Department to enforce the trespass
> laws of the Commonwealth of Virginia . . .
> [upon RRHA property known as] Whitcomb
> Court. . . . [E]ach and every Richmond
> Police Department officer [is authorized] to
> serve notice, either orally or in writing,
> to any person [found on RRHA property] when
> such person is not a resident, employee, or
> such person cannot demonstrate a legitimate
> business or social purpose for being on the
> premises.

According to a printed brochure issued by RRHA to the Whitcomb Court residents, "unauthorized persons," who are subject to the barment proceedings, are all non-residents who cannot demonstrate that they are on the premises "visiting a lawfully residing resident, or on the development conducting legitimate business."

The police officer makes the determination whether a person is to be barred, determines whether the person is a tenant or is

there at the invitation of a tenant, or whether there is a legitimate reason for being on the property. A person simply has to fail to fit within the category of people whom RRHA has deemed entitled to be on the streets and sidewalks adjacent to the public housing development to be barred. Once barred, the person who returns is a trespasser without regard to whether, on that subsequent occasion, he or she is there on legitimate business or at the invitation of a Whitcomb Court tenant.

Hicks was convicted of trespassing on the property of Whitcomb Court on February 10, 1998 and June 26, 1998, respectively, and of damaging property in Whitcomb Court on April 27, 1998.[2] On April 14, 1998, Mrs. Gloria Rogers, the housing manager at Whitcomb Court, served a written notice on Hicks advising him that he was banned from the Whitcomb Court property. He was "not to trespass on RRHA property," and if he was "seen or caught on the premises, [he would] be subject to arrest by the police." Hicks' mother, his baby, and his baby's mother live at Whitcomb Court. After receiving the notice, Hicks twice returned to Whitcomb Court to speak with Mrs. Rogers to seek permission to come back on the property. His requests were denied. On January 20, 1999, Officer James Laino (Laino) observed Hicks walking westbound in the 2300 block of Bethel Street, one of the "privatized" streets adjacent to Whitcomb

---

[2] Appellant's barment from Whitcomb Court is not related to his damaging property at Whitcomb Court.

Court. Laino knew that Hicks was barred from the property. Hicks explained to Laino that he was on the property "bringing pampers to his baby." During the conversation, a female came out and approached Laino and Hicks. Hicks indicated he was visiting her. Laino issued Hicks a summons for trespassing.

Hicks was tried in the general district court without the presence of a Commonwealth's attorney. The district court judge conducted the questioning of Hicks. Hicks objected to this procedure. The judge struck Hicks' testimony at the end of the trial and convicted him. Hicks noted an appeal to the circuit court.

Prior to trial in the circuit court, Hicks filed a motion requesting a remand to the general district court for a new trial and an order requiring a Commonwealth's attorney to be present and to represent the Commonwealth at this new general district court trial. The circuit court denied the motion on the ground that it lacked authority to remand the trial. Hicks also moved to dismiss the charge of trespass on the ground that the RRHA's trespass policy violated the First and Fourteenth Amendments to the United States Constitution. The circuit court denied his motion to dismiss and found Hicks guilty of trespass.

II. CONSTITUTIONALITY OF RICHMOND ORDINANCE

Appellant argues that Richmond City Ordinance No. 97-181-197 and the RRHA barment-trespass procedure violate the First and Fourteenth Amendments of the United States

Constitution.[3]  Thus, we must determine whether the First and Fourteenth Amendments are violated by the trespass statute as enforced under authority granted by RRHA to Richmond City police officers to bar people on the streets surrounding and adjacent to Whitcomb Court and who do not fit within a narrowly defined group of people.  The critical issue is whether the "privatized" streets and sidewalks are public and as such are a "traditional public forum," or whether they are "private" and, thereby, a "nonpublic forum."  If they are "traditional public forum," then the barment-trespass procedure must satisfy the strict scrutiny requirement that the procedure be narrowly tailored to serve a compelling state interest.  See Daniel v. City of Tampa, 38 F.3d 546 (11th Cir. 1994).

## A.  "PUBLIC FORUM"

The constitutionality of government regulation of First Amendment rights is analyzed under a public fora analysis.  See Warren v. Fairfax County, 196 F.3d 186, 190 (4th Cir. 1999).

---

[3] The Commonwealth argues that appellant is barred from contesting the validity of the barment-trespass procedure because he did not present a defense to his presence on RRHA property or challenge his original barment notice or the barment-trespass procedure itself prior to being charged with trespass on January 20, 1999.  Therefore the Commonwealth argues that he is improperly collaterally attacking his conviction.  We disagree.  Prior to his trial for this trespass charge, appellant challenged the barment-trespass procedure as unconstitutional.  At trial, appellant's defense to the trespass charge was that the barment-trespass procedure violated his constitutional rights and, thus, he could not be guilty of trespass because he had a constitutional right to be walking on

The public forum analysis was created to
recognize that the government must be able
to limit the use of its property to the
intended purpose for which the property was
created and to limit access to those
rightfully conducting business there.
Toward that end, the Court has identified at
least three types of fora for First
Amendment purposes, each subject to a
different regime of constitutional scrutiny:
the traditional public forum, the designated
public forum, and the nonpublic forum.  The
Court distinguishes between these fora based
upon the physical characteristics of the
property, including its location, the
objective use and purposes of the property
and government intent and policy with
respect to the property, which may be
evidenced by its historic and traditional
treatment.

Id. at 190-91 (internal citations omitted).  Public streets and

sidewalks are repeatedly referred to as the archetype of a

traditional public forum because they "are among those areas of

public property that traditionally have been held open to the

public for expressive activities and are clearly within those

areas of public property that may be considered, generally

without further inquiry, to be public forum property."  United

States v. Grace, 461 U.S. 171, 179 (1983).

Wherever the title of streets and parks may
rest, they have immemorially been held in
trust for the use of the public and, time
out of mind, have been used for purposes of
assembly, communicating thoughts between
citizens, and discussing public questions.
Such use of the streets and public places
has, from ancient times, been a part of the
privileges, immunities, rights, and

Bethel Street.  Thus, we find that appellant timely raised the
issue of the validity of the barment-trespass procedure.

> liberties of citizens.  The privilege of a
> citizen of the United States to use the
> streets and parks for communication of views
> on national questions may be regulated in
> the interest of all; it is not absolute, but
> relative, and must be exercised in
> subordination to the general comfort and
> convenience, and in consonance with peace
> and good order; but it must not, in the
> guise of regulation, be abridged or denied.

Hague v. Committee for Industrial Organization, 307 U.S. 496,

515-16 (1939).

"Ownership [of streets and sidewalks] does not always mean

absolute dominion."  Marsh v. Alabama, 326 U.S. 501, 506 (1946)

(holding that privately owned streets and sidewalks in a company

owned town which are built and operated primarily to benefit the

public are traditional public forums that are protected by First

Amendment constitutional guarantees).  In Grace, 461 U.S. 171,

the United States Supreme Court addressed the ability of the

government to redefine certain public sidewalks in front of the

United States Supreme Court Building as a non-public forum.

There was no separation, fence or any other indication to

persons entering the sidewalks that served as the perimeter of

the Court grounds that they entered a non-public forum.  "The

sidewalks comprising the outer boundaries of the Court grounds

are indistinguishable from any other sidewalks in Washington

D.C., and . . . [there is] no reason why they should be treated

any differently."  Id. at 179.  The Court held that:

> "Congress[, no more than a suburban
> township,] may not by its own ipse dixit

> destroy the 'public forum' status of streets
> and parks which have historically been
> public forums. . . ."  The inclusion of the
> public sidewalks within the scope of § 13k's
> prohibition, however, results in the
> destruction of public forum status that is
> at least presumptively impermissible.
> Traditional public forum property occupies a
> special position in terms of First Amendment
> protection and will not lose its
> historically recognized character for the
> reason that it abuts government property
> that has been dedicated to a use other than
> as a forum for public expression.  Nor may
> the government transform the character of
> the property by the expedient of including
> it within the statutory definition of what
> might be considered a non-public forum
> parcel of property.

Id. at 180 (quoting U.S. Postal Service v. Greenburgh Civic

Ass'ns, 453 U.S. 114, 133 (1981) (quotation altered to reflect

original wording).

As in Grace, the streets surrounding Whitcomb Court deeded

to RRHA were not separated in any manner from the other streets

and sidewalks in the area.  The sole indication to the public

that they have entered a "private" street are "red and white

signs . . . approximately 18 inches to almost 24 inches by about

12 inches . . . spaced about every hundred feet on each block"

and on each building indicating that "these streets are

privatized and all the property is privatized, no trespass."

There is no indication to the public until after they enter onto

the "privatized" streets that the streets are any different from

the rest of the streets in the city and are now private

property.  Some of the "privatized" streets are "private" for

only a couple of blocks and are public on both ends of the "privatized" blocks. Thus, although the street signs declare the streets "private" and for the exclusive use of residents and those persons there on legitimate business, the streets and sidewalks continue to serve the same functions and are equally accessible to the public as before the City of Richmond passed the ordinance "privatizing" the streets.

Once a person has entered a "privatized" street he or she is subject to the barment-trespass procedure. A trespasser who receives a warning is informed that he or she is "not to trespass upon RRHA property" or "Whitcomb Court." However, the warning does not inform the person that the streets and sidewalks surrounding the complex are a part of RRHA property.

Because the streets appear no different from other streets in Richmond and serve the same function they did prior to "privatization," "we can discern no reason why they should be treated any differently" from any other street or sidewalk. Grace, 461 U.S. at 179. The City of Richmond is not permitted to transform the public streets and sidewalks in Whitcomb Court into private, non-public property simply by passing an ordinance declaring them closed, conveying them to another governmental entity, the RRHA, and placing signs along the streets. See Marsh, 326 U.S. 501; Grace, 461 U.S. 171. Thus, the streets and sidewalks surrounding Whitcomb Court did not lose their public forum status when the City of Richmond deeded them to the RRHA

and put some signs on the street indicating they were now private property. Hence, the barment-trespass procedure must satisfy the rigors of strict scrutiny to pass constitutional muster.

The Commonwealth argues that our prior decisions in Collins v. Commonwealth, 30 Va. App. 443, 517 S.E.2d 277 (1999), and Holland v. Commonwealth, 28 Va. App. 67, 502 S.E.2d 145 (1998), allow housing authorities to restrict access to their property and designate police officers to serve barment notices and arrest persons trespassing on housing authority property. We have previously approved a process by which police officers may be designated as agents of a housing authority to serve barment notices on persons trespassing on housing authority property, see Collins, 30 Va. App. at 449, 517 S.E.2d at 280; Holland, 28 Va. App. at 70-76, 502 S.E.2d at 146-49. However, what distinguishes this case from those is that Hicks was found guilty of trespass for having gone upon Bethel Street and the adjacent sidewalk, whereas in both Holland and Collins, the defendants were on the non-public grounds and in the buildings of the housing authority.

The Commonwealth also contends that we should follow the Eleventh Circuit's decision in Daniel, 38 F.3d 546. The Daniel court authorized a housing authority to enforce a no trespassing policy identical to the one at issue in the instant case. However, unlike the instant case, in Daniel, "the City-owned

streets and sidewalks surrounding and intersecting with the Housing Authority property [were] open to the public" and Daniel had "unlimited access to the City-owned streets and sidewalks adjacent to the housing complex." Id. at 548 n.3 & 550; see also Walker v. Georgetown Hous. Auth., 677 N.E.2d 1125, 1128 (Mass. 1997) (calling into question the reasoning of the Daniel court and the applicability of the ruling to streets and sidewalks that were kept "open to the public"). Thus, in Daniel, the no trespassing policy was limited to the non-public forum consisting of the housing authority's buildings and grounds and did not include the adjacent streets and sidewalks as the RRHA policy does in the instant case. Bethel Street is a public street that was built and maintained with public funds to provide access by the public to that part of Richmond. As with all public streets and thoroughfares, historically and traditionally public streets have served as a locale for the free exchange and dissemination of ideas and have served as an area where citizens can freely and lawfully congregate or move about and exchange discourse.

The fact that legal title to the streets is transferred from a municipal government to a government agency which owns and operates a public housing development does not change the public nature and character of the streets and sidewalks which provide access to the public to this part of the City. See Marsh, 326 U.S. 501. The City cannot transform the public

streets surrounding Whitcomb Court into non-public streets by declaring them closed by ordinance and conveying them to another governmental entity when they continue to serve the same public purpose as before.

B.   "STRICT SCRUTINY"

Therefore, the City of Richmond's and RRHA's attempt to control access to and movement upon the streets and sidewalks of the city is "subject to strict scrutiny; [it] must be narrowly tailored to serve [the] compelling state interest" of providing safe housing to the development's residents.  Daniel, 38 F.3d at 549.  The stated goal of the RRHA barment-trespass procedure is to ensure a safe environment free from criminal activity for the residents of Whitcomb Court.  We agree that the City of Richmond has a compelling interest in protecting its citizens and preventing criminal activity.  However, it may not, in its endeavor to control crime, pass and enforce a regulation so broad in scope that it unduly restricts or criminalizes innocent constitutionally protected behavior.

The barment-trespass procedure used in this case inhibits a person's constitutionally protected "'right to remove from one place to another according to inclination'" and the person's right to "remain in a public place of his choice."  Chicago v. Morales, 527 U.S. 41, 53, 54 (1999) (quoting Williams v. Fears, 179 U.S. 270, 274 (1900)).  In Morales, the United States Supreme Court held that a city ordinance designed to reduce

crime by criminalizing "loitering" violates the Constitution. The Court stated that "it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage' or the right to move 'to whatsoever place one's own inclination may direct'" and the ordinance "broadly covers a significant amount" of activity that is constitutionally protected. Id. at 53-54 (internal citations ommitted). The City of Richmond and RRHA barment-trespass procedure also prevents a person from standing upon the streets surrounding Whitcomb Court without a "legitimate reason." Thus, it implicates the same concerns addressed in Morales.

The barment-trespass procedure is not limited so as to encompass only those persons whose conduct the City and RRHA were seeking to curtail. The procedure is so broad that citizens who merely drive or walk upon one of the "privatized" streets fall within the defined group of people not authorized by the barment procedure to be upon the streets and sidewalks and, thus, may be deemed guilty of criminal conduct. A citizen need not commit a crime, intend to commit a crime or infringe upon the privacy of the residents of Whitcomb Court to be in violation of the barment-trespass statute and ordinance. The Commonwealth presented no evidence that appellant did anything other than exercise his constitutionally protected right to walk upon the streets and sidewalks of the City of Richmond.

Perhaps, had Bethel Street been gated, barricaded, or physically restricted to traffic where the public was not free to travel, as with gated communities, the street could be considered non-public and not a "traditional public forum."  But the City can no more "close" the streets in Whitcomb Court and leave them open to the public, thereby purporting to make them a "non-public forum," than it could declare "closed" all streets in Richmond's troubled neighborhoods and residential areas, thereby denying access to all citizens except the residents and their invitees and others specifically approved.  Neighborhood streets, such as those in Whitcomb Court, are public streets, paid for and maintained with public funds, for the use and benefit of the public.

While a public entity can restrict the use of public property or buildings to those who are using the property for its intended "non-public" purpose, such as an office building, it cannot restrict public property that is considered a "traditional public forum," such as a street or sidewalk, that is being used in a lawful way and for a lawful purpose that is constitutionally protected.  See United States v. Kokinda, 497 U.S. 720, 727 (1990) (holding that sidewalk in front of a post office "constructed solely to provide for the passage of individuals engaged in postal business" is a non-public forum).  Here, in effect, the City and RRHA, by converting the streets and sidewalks to private property, attempted to confer upon RRHA

the same rights as a private property owner who may restrict everyone from coming upon the private property owner's property except the owner's tenants and the tenants' invitees, regardless of whether the invitees had done anything unlawful. However, the United States Supreme Court has held that even a private entity which owns the entire town cannot close the streets to deny the public their constitutional rights. See Marsh, 326 U.S. at 506. Therefore, the barment-trespass procedure at issue here is not narrowly tailored to encompass only those activities the RRHA sought to exclude from their property.

### III. CONCLUSION

Thus, we hold that Richmond's barment-trespass procedure, when strictly scrutinized, is not narrowly tailored to serve the government's compelling interest, the standard that must be met when the government attempts to regulate activity in a "traditional public forum."[4] The RRHA's privatization effort unconstitutionally infringes upon a citizen's First and Fourteenth Amendment rights to lawfully be present in a public place. Accordingly, we hold that city ordinance No. 91-181-197 as enforced through the barment-trespass procedure is

---

[4] In his petition for appeal, appellant also requested this Court to set aside the order revoking his suspended sentences on his two prior convictions for trespassing at Whitcomb Court and his prior conviction for damaging property at Whitcomb Court. However, appellant did not pursue this on brief or in oral argument. Therefore, we remand this case to the circuit court to reconsider the revocation of his suspended sentences in light of our holding in this opinion.

unconstitutional and we reverse and dismiss appellant's

conviction.[5]

> <u>Reversed and dismissed in part,
> reversed and remanded in part.</u>

---

[5] Because we reverse on the failure of the City of Richmond to establish the constitutionality of the barment-trespass procedure, we do not address appellant's arguments regarding errors in the general district court proceedings or whether the barment-trespass procedure violated the procedural due process requirements of the Fourteenth Amendment.

Humphreys, J., with whom Willis, Bray, Bumgardner and Agee, JJ., join, dissenting.

## I. Constitutional Issues

I must respectfully dissent from the majority opinion, which holds that the Richmond Redevelopment and Housing Authority's (RRHA) barment proceeding and trespass policy violate the First and Fourteenth Amendments of the United States Constitution.

First, I do not agree that Hicks properly raised his objections to RRHA's barment procedures. Hicks concedes that the RRHA provided him with a barment notice on April 14, 1998. This barment notice was issued to Hicks pursuant to a valid ordinance adopted by the City of Richmond, both requiring and authorizing RRHA to take any necessary steps to "give the appearance that the closed streets . . . are no longer public streets and that they are in fact private streets." The notice, which Hicks signed in acknowledgment of its receipt, specifically prohibited Hicks from entering onto RRHA premises for any reason.

Subsequently, on at least one occasion, Hicks approached the housing manager for the Whitcomb Court property, Gloria Rogers, to request that he be able to visit his mother, a resident of that property. Rogers denied his request and again informed him that he was barred from entering the property pursuant to the barment notice. However, other than speaking to

Rogers, Hicks took no steps to appeal his barment through official channels of the Authority or the courts. Instead, he ignored the barment and was arrested and convicted for trespassing, as well as for damaging property in Whitcomb Court, prior to his arrest for the incident of January 20, 1999. In addition, for this prior trespass conviction, Hicks received a suspended sentence on the court-ordered condition that he keep the peace and be of good behavior for three years. However, Hicks continued to ignore the barment notice, as well as the court order, and trespassed again on January 20, 1999. Now, for the first time, in connection with his conviction for the January 20, 1999 trespass, Hicks argues that the barment violated his constitutional rights under the First and Fourteenth Amendments.

Hicks' arguments in this regard represent an untimely and improper collateral attack on his barment status. We have held, in the context of an habitual offender adjudication, that where a defendant has knowledge of an underlying order, never appeals the order, and subsequently violates the order, he cannot attack the underlying order in the new proceeding. See Morgan v. Commonwealth, 28 Va. App. 645, 507 S.E.2d 665 (1998). We based our decision in Morgan on Mays v. Harris, 523 F.2d 1258 (4th Cir. 1975), wherein the Fourth Circuit Court of Appeals held that an habitual offender who failed to appeal the underlying conviction, could not, with impunity, choose to ignore the

adjudication and resulting injunction "for, . . . 'in the fair administration of justice, no man can be judge in his own case.'" Id. at 1259 (quoting Walker v. Birmingham, 388 U.S. 307, 321 (1967) (holding that a party can be held in contempt of court for violating an injunction, even if the injunction was invalid under the Federal Constitution)).

I believe the principle advanced in Walker, Mays and Morgan is equally applicable to this case. Here, Hicks was barred from the property pursuant to authority granted RRHA by ordinance which, in turn, provided an administrative procedure for contesting such barment. Hicks had knowledge of his barment from the property, he had been previously convicted of trespassing on the property prior to his trial for the trespassing incident of January 20, 1999, and in conjunction with that conviction, he had been ordered by the court to maintain good behavior for three years. Despite the opportunity presented by the prior court proceedings, as well as the availability of an administrative appellate procedure, Hicks raised no objection to the propriety of the barment until his trial for the January 20, 1999 incident. Pursuant to the principles set forth in the above-cited cases, I do not believe Hicks should be allowed to have bypassed "orderly judicial review of [the barment and his prior trespassing convictions] before disobeying [them]." Walker, 388 U.S. at 320.

I would also reject Hicks' challenges to the constitutionality of RRHA's policy. "In assessing the constitutionality of a statute or ordinance, courts must presume that the legislative action is valid. Consequently, the burden is on the challenger to demonstrate the constitutional defect." Coleman v. City of Richmond, 5 Va. App. 459, 462, 364 S.E.2d 239, 241 (1988). I would hold that Hicks failed to meet this burden.

Hicks essentially argues, on brief and orally, that because the streets of Whitcomb Court were once public streets and sidewalks owned by the City of Richmond, any statute restricting his presence thereon is unconstitutionally overbroad or vague. Hicks further alleges that because the policy is overbroad and vague, it impinges upon his First Amendment guarantees of free speech and implied guarantee of free association, as well as his Fourteenth Amendment due process protections.

"[G]enerally, a litigant may challenge the constitutionality of a law only as it applies to him or her." Id. at 463, 364 S.E.2d at 241. "The traditional rule is that a person to whom a [policy] may be constitutionally applied may not challenge that [policy] on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." New York v. Ferber, 458 U.S. 747, 769 (1982). Yet,

> [w]hat has come to be known as the First
> Amendment overbreadth doctrine is one of the
> few exceptions to this principle and must be
> justified by weighty countervailing
> policies.  The doctrine is predicated on the
> sensitive nature of protected expression
> . . . [and] [i]t is for this reason that we
> have allowed persons to attack overly broad
> statutes even though the conduct of the
> person making the attack is clearly
> unprotected and could be proscribed by a law
> drawn with the requisite specificity.

Id.  The United States Supreme Court has also allowed a facial

attack on the grounds of vagueness even though the litigant's

own speech was unprotected.  See Kolender v. Lawson, 461 U.S.

352 (1983).

Nevertheless, "where conduct and not merely speech is

involved, . . . the overbreadth of a statute must not only be

real, but substantial as well, judged in relation to the

[policy's] plainly legitimate sweep."  Ferber, 458 U.S. at 770.

This distinction is ignored by the majority.  "We have never

held that a [policy] should be invalid on its face merely

because it is possible to conceive of a single impermissible

application . . . ."  Id. at 771.  Instead, "[i]n a facial

challenge to the overbreadth and vagueness of a law, a court's

first task is to determine whether the enactment reaches a

substantial amount of constitutionally protected conduct."

Houston v. Hill, 482 U.S. 451, 458 (1987).

A policy will be deemed unconstitutionally overbroad if it

is "one that is designed to burden or punish activities which

are not constitutionally protected, but the [policy] includes within its scope activities which are protected by the First Amendment." Parker v. Commonwealth, 24 Va. App. 681, 690, 485 S.E.2d 150, 154-55 (1997). A policy will be deemed unconstitutionally vague if "it does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Santillo v. Commonwealth, 30 Va. App. 470, 482, 517 S.E.2d 733, 739 (1999) (citation omitted).

It is axiomatic that in making such a determination, an appellate court should refrain from speculation outside of the record before it. Here, contrary to Hicks' argument, the policy clearly does not bar individuals from freely associating with their friends or loved ones living on RRHA property, nor does it prohibit persons from exercising free expression. Further, the policy does not automatically delineate every non-resident who uses a sidewalk owned by RRHA to be a trespasser, as suggested by the majority. Instead, it merely authorizes the Richmond police, as agents of the RRHA, to ban persons from the property who enter upon the property without permission from a resident or the RRHA. Significantly, any unauthorized individuals are not automatically arrested, but they are warned that they are

not to enter the property in the future.[6]  Further, those who have been formally banned from the property are not without recourse and can request, through the proper RRHA channels, to have the ban removed.

Thus, I would consider this policy as a "paradigmatic case of [one] whose legitimate reach dwarfs its arguably impermissible applications."  Ferber, 458 U.S. at 773.  Under these circumstances, I would find that the policy is not "substantially overbroad" and/or vague and that "whatever overbreadth [or vagueness] may exist should be cured through a case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied."  Broadrick v. Oklahoma, 413 U.S. 601, 615-16 (1973).

The majority has found that the Whitcomb Court property is a traditional public forum simply because the property in question is a sidewalk adjoining a street constructed and once owned by the City of Richmond.  However, neither the evidence in this record nor the precedents of the United States Supreme Court compel such a finding.  I agree that "[t]he Supreme Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use

---

[6] Contrary to the majority's statement otherwise, Hicks presented no evidence suggesting that the warning does not inform persons that the streets and sidewalks surrounding the complex are part of RRHA property.

the property for other purposes.  Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum."  Paff v. Kaltenbach, 204 F.3d 425, 431 (3rd Cir. 2000) (citing Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. 788, 800 (1985)).  However, "[w]hen the relevant public property is determined to be a 'non-public forum,' rather than an 'open forum' or a 'designated forum,' the government has greater freedom to restrict speech." Id.

A traditional public forum is property which has the physical characteristics of a public thoroughfare, which has the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, and by which history and tradition has been used for expressive conduct.  See Warren v. Fairfax County, 169 F.3d 190, 198 (4th Cir. 1999) (Murnaghan, J., dissenting), adopted and incorporated by reference by the majority in Warren v. Fairfax County, 196 F.3d 186, 191 (4th Cir. 1999) (en banc).  As the majority also correctly points out, a sidewalk adjoining a public street will generally fall into this category.  See Frisby v. Schultz, 478 U.S. 474, 481 (1988).  However, the sidewalk at issue here is not the "quintessential" public sidewalk which has been "immemorially held in trust for the use of the public," or which has been traditionally "used for public assembly and debate, the hallmarks of a traditional public

forum."  See Frisby, 478 U.S. at 480-81; see also United States

v. Grace, 461 U.S. 171, 179-80 (1983) (instructing that it is

incorrect to assert that every "public sidewalk" is a public

forum).

While it is true that the City of Richmond cannot transform

public streets and sidewalks into private, non-public property

simply by passing an ordinance declaring them private or closed

property, this is but one factor to consider in determining the

nature of the sidewalks at issue.  See Marsh v. Alabama, 326

U.S. 501 (1946); see also United States v. Kokinda, 497 U.S.

720, 727 (1990).  Moreover, contrary to the majority's

conclusion, "[t]he mere physical characteristics of the property

cannot dictate forum analysis."  Kokinda, 497 U.S. at 727.

Instead, we must also consider the location and purpose of the

sidewalk, in order to determine its character as public or

private.  See id. at 728-29.

I agree with the majority that a "critical issue" is also

whether the privatized streets continue in their previous

character as a traditional public forum.  However, contrary to

the majority, I would find that neither the purpose, the

treatment, nor the physical characteristics of the Whitcomb

Court sidewalks support the majority's conclusion that they fall

within the parameters of a traditional public forum.

First, the Whitcomb Court property, including its streets

and sidewalks, has been deeded from the City to the RRHA.

Although ignored by the majority, a condition for the closure of the streets by the City required RRHA to "make provisions to give the appearance that the closed streets, particularly at the entrances, [were] no longer public streets and that they [were] in fact, private streets." In order to meet this requirement, although the streets and sidewalks of the development were not physically barricaded, RRHA posted red and white signs, "approximately 18 inches to almost 24 inches by about 12 inches" in size, on each side of the buildings, as well as on the streets of the property, on each block, about every 100 feet. These signs clearly indicated that the street and sidewalks had been privatized and that trespassing was prohibited.[7] The record further indicates that RRHA held meetings with residents and provided pamphlets explaining the privatization. The pamphlet encouraged residents to explain the privatization to their neighbors and guests in order to facilitate the change. Finally, for at least a year prior to Hicks' present arrest, RRHA and the Richmond police treated the property as private property by determining whether visitors were authorized and by banning unauthorized persons from the property.

In concluding that "[t]here is no indication to the public until after they enter onto the 'privatized' streets that [they]

---

[7] Officer Llaino testified to the size, number and location of the signs and that the substance of the message on the signs was that "all the property had been privatized and that trespass[ing was] prohibited." This evidence was uncontradicted.

are any different from the rest of the streets in the city," the majority both improperly assumes a fact-finding function outside the record in this case and improperly shifts the burden of proof concerning the character of the forum away from Hicks. A review of the character of the "privatized" streets and sidewalks, restricted to the record of the trial court, reveals that other than exceptions for school buses, delivery trucks, city service vehicles and law enforcement, there is absolutely no evidence that the streets and/or sidewalks of the Whitcomb Court property remained open to a public flow of traffic, as the majority suggests. Furthermore, even though sidewalks "may be open to the public, [that] fact alone does not establish that such areas must be treated as traditional public fora under the First Amendment." Kokinda, 497 U.S. at 729.

Thus, given the clear intent by the City of Richmond to remove the streets of Whitcomb Court from the category of thoroughfares available for use by the general public and given the notice to the residents and the public at large in the form of repeated and obvious signage that the streets and sidewalks were no longer "public" in character, I would hold that the restrictions imposed by RRHA must be analyzed under the test for non-public property: they must be reasonable and "not an effort to suppress expression merely because public officials oppose

the speaker's view."  Id. at 730 (citing Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46 (1983)).

There is no dispute here that the stated purpose for RRHA's trespassing enforcement effort, which was to "provide a safe environment for citizens in a place often used to sell drugs," is reasonable and legitimate.  In fact, we have previously upheld the delegation of authority by a public housing complex to police officers to bar unauthorized individuals from the property for the purpose of preventing crime, protecting property and preserving the peace.  See Holland v. Commonwealth, 28 Va. App. 67, 502 S.E.2d 145 (1998).

Moreover, as stated above, the record is clear that a person is not considered "unauthorized" until he or she has entered the property without the permission of either a resident or an RRHA official.  Even then, and notwithstanding numerous and obvious signs that acquaint anyone able to read that the character of the property is private and not public, unless the individual is engaged in some type of criminal activity, that individual is not formally barred from the property until after he or she has been warned not to enter the property without permission.  Once an individual is barred from the property, a procedure is available to request removal of the barment.  Further, Hicks produced no evidence that either RRHA or the Richmond police have ever banned any form of expression based on its content.

Based on this record, I would find that any potential interference with an individual's right of expression and/or intimate association with residents of Whitcomb Court, or to "loiter" on the property, which, although publicly owned, in my judgment constitutes a "non-public forum" for First Amendment purposes, is reasonable, limited and justified to achieve the legitimate purpose of protecting these residents from crime. Therefore, I would hold that Hicks' conduct at the time of his arrest - namely, knowingly trespassing on private property - was not constitutionally protected.

## II. Motion to Remand

Because I would hold that RRHA's barment proceeding and trespass policy with respect to Hicks do not violate the First and Fourteenth Amendments, I would address the remaining assignment of error.

Hicks argues that he was entitled to have his case remanded to the general district court for a new trial before another judge because the judge of that court who presided over the initial trial improperly assumed the role of a prosecutor by "cross-examining" him.

The Supreme Court of Virginia has long held that there is no inherent damage to a fair trial when a judge asks questions of a witness.

> [A] trial judge [may] ask questions of a
> witness either on his examination in chief
> or on cross-examination. The practice is

common and perfectly permissible. Indeed, there are times when it is his duty to do so. He is not to sit there and see a failure of justice on account of omissions to prove facts plainly within the knowledge of a witness, but the character of his questions should not be such as to disclose bias on his part, or to discredit the truthfulness of the witness. "For the purpose of eliciting evidence which has not otherwise been brought out, it is proper for the judge to put the questions to a witness either on his examination in chief or on his cross-examination, and where anything material has been omitted, it is sometimes his duty to examine a witness."

Mazer v. Commonwealth, 142 Va. 649, 655, 128 S.E. 514, 516 (1925) (citations omitted).

In addition, we have held that "the trial court, in the exercise of its sound discretion, may permit jurors to submit written questions to be asked of a witness." Williams v. Commonwealth, 24 Va. App. 577, 582, 484 S.E.2d 153, 155 (1997). We also noted in Williams that "[t]he function of a jury is to assure a fair and equitable resolution of all factual issues. The jury serves as the final arbiter of the facts, 'charged with weighing the evidence, judging the credibility of the witnesses, and reaching a verdict' in the case." Id. at 582, 484 S.E.2d at 155. This function belongs no less to the court when serving as the fact finder. We need not determine here whether the general district court judge's questions demonstrated an inappropriate bias or prejudice because the court granted Hicks' motion to strike the questions as well as his answers.

In addition, the remedy provided to any defendant in a criminal case who perceives error on the part of a trial court is to exercise the right to appeal the matter to a higher tribunal. In the context of misdemeanors tried in the district courts, the General Assembly has established a right to a trial de novo in the circuit court.[8] A de novo hearing means a trial anew. On appeal, a conviction in the district court is annulled, and a new trial is held in the circuit court. See Ledbetter v. Commonwealth, 18 Va. App. 805, 447 S.E.2d 250 (1994).

While it would clearly be preferable and in its interest for the Commonwealth to be represented by counsel in every case in which it is a party, the General Assembly has declined to mandate such representation. Code § 15.2-1627(B) recites the duties of Commonwealth's Attorneys and their assistants.[9] This statute only requires Commonwealth's Attorneys to prosecute

---

[8] Code § 16.1-136 provides in pertinent part: "Any appeal taken under the provisions of this chapter shall be heard de novo in the appellate court and shall be tried without formal pleadings in writing; and, . . . the accused shall be entitled to trial by a jury in the same manner as if he had been indicted for the offense in the circuit court."

[9] Code § 15.2-1627(B) provides in pertinent part: "The attorney for the Commonwealth . . . shall have the duties and powers imposed upon him by general law, including the duty of prosecuting all warrants, indictments or informations charging a felony, and he may in his discretion, prosecute Class 1, 2 and 3 misdemeanors, or any other violation, the conviction of which carries a penalty of confinement in jail, or a fine of $500 or more, or both . . . ."

felonies and provides that a prosecutor "may in his discretion, prosecute Class 1, 2 and 3 misdemeanors."  Thus, the General Assembly decided as a matter of policy to place the discretion for the representation of the Commonwealth in misdemeanor cases in the hands of the executive branch rather than the judicial branch of government.

Hicks relies on the decision of the Supreme Court of the United States in Ward v. Village of Monroeville, 409 U.S. 57 (1972), as authority for his argument that a trial de novo does not cure errors committed in a lower court.  I find his reliance on Ward is misplaced.  In Ward, the Supreme Court addressed a systemic problem of bias inherent in the infrastructure of local mayors' courts.  There, mayors of villages sat as judges in the courts, and a major portion of village income was derived from the collection of these fines.  In finding that such a scheme violates the due process rights of criminal defendants in the mayors' courts, Justice Brennan noted that the constitutional infirmity was grounded in the separation of powers doctrine.

> Although "the mere union of the executive power and the judicial power in him cannot be said to violate due process of law," the test is whether the mayor's situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused." Plainly that "possible temptation" may also exist when the mayor's executive responsibilities for village finances may

> make him partisan to maintain the high level
> of contribution from the mayor's court.

Id. at 60 (citations omitted).

Hicks does not allege, nor do I find, such systemic bias in the procedural structure of the district courts in the Commonwealth. Thus, assuming without deciding that the questions propounded by the general district court judge constituted error, I would hold that the trial de novo in the circuit court provided an adequate remedy.

For all of these reasons, I dissent and would affirm the judgment of the trial court.