*64 HUMPHREYS, Judge, with whom WILLIS, BRAY, BUMGARDNER and AGEE, JJ.,
join, dissenting.
I. Constitutional Issues
I must respectfully dissent from the majority opinion, which holds that the Richmond Redevelopment and Housing Authority’s (RRHA) barment proceeding and trespass policy violate the First and Fourteenth Amendments of the United States Constitution.
First, I do not agree that Hicks properly raised his objections to RRHA’s barment procedures. Hicks concedes that the RRHA provided him with a barment notice on April 14, 1998. This barment notice was issued to Hicks pursuant to a valid ordinance adopted by the City of Richmond, both requiring and authorizing RRHA to take any necessary steps to “give the appearance that the closed streets ... are no longer public streets and that they are in fact private streets.” The notice, which Hicks signed in acknowledgment of its receipt, specifically prohibited Hicks from entering onto RRHA premises for any reason.
Subsequently, on at least one occasion, Hicks approached the housing manager for the Whitcomb Court property, Gloria Rogers, to request that he be able to visit his mother, • a resident of that property. Rogers denied his request and again informed him that he was barred from entering the property pursuant to the barment notice. However, other than speaking to Rogers, Hicks took no steps to appeal his barment through official channels of the Authority or the courts. Instead, he ignored the barment and was arrested and convicted for trespassing, as well as for damaging property in Whitcomb Court, prior to his arrest for the incident of January 20, 1999. In addition, for this prior trespass conviction, Hicks received a suspended sentence on the court-ordered condition that he keep the peace and be of good behavior for three years. However, Hicks continued to ignore the barment notice, as well as the court order, and trespassed again on January 20, 1999. Now, for the first time, in connection with his conviction for the January 20, 1999 trespass, Hicks argues that the *65 barment violated his constitutional rights under the First and Fourteenth Amendments.
Hicks’ arguments in this regard represent an untimely and improper collateral attack on his barment status. We have held, in the context of an habitual offender adjudication, that where a defendant has knowledge of an underlying order, never appeals the order, and subsequently violates the order, he cannot attack the underlying order in the new proceeding. See Morgan v. Commonwealth, 28 Va.App. 645, 507 S.E.2d 665 (1998). We based our decision in Morgan on Mays v. Harris, 523 F.2d 1258 (4th Cir.1975), wherein the Fourth Circuit Court of Appeals held that an habitual offender who failed to appeal the underlying conviction, could not, with impunity, choose to ignore the adjudication and resulting injunction “for, ... ‘in the fair administration of justice, no man can be judge in his own case.’” Id. at 1259 (quoting Walker v. Birmingham, 388 U.S. 307, 321, 87 S.Ct. 1824, 1832, 18 L.Ed.2d 1210 (1967) (holding that a party can be held in contempt of court for violating an injunction, even if the injunction was invalid under the Federal Constitution)).
I believe the principle advanced in Walker, Mays and Morgan is equally applicable to this case. Here, Hicks was barred from the property pursuant to authority granted RRHA by ordinance which, in turn, provided an administrative procedure for contesting such barment. Hicks had knowledge of his barment from the property, he had been previously convicted of trespassing on the property prior to his trial for the trespassing incident of January 20, 1999, and in conjunction with that conviction, he had been ordered by the court to maintain good behavior for three years. Despite the opportunity presented by the prior court proceedings, as well as the availability of an administrative appellate procedure, Hicks raised no objection to the propriety of the barment until his trial for the January 20, 1999 incident. Pursuant to the principles set forth in the above-cited cases, I do not believe Hicks should be allowed to have bypassed “orderly judicial review of [the barment and his prior trespassing convictions] *66 before disobeying [them].” Walker, 388 U.S. at 320, 87 S.Ct. at 1824.
I would also reject Hicks’ challenges to the constitutionality of RRHA’s policy. “In assessing the constitutionality of a statute or ordinance, courts must presume that the legislative action is valid. Consequently, the burden is on the challenger to demonstrate the constitutional defect.” Coleman v. City of Richmond, 5 Va.App. 459, 462, 364 S.E.2d 239, 241 (1988). I would hold that Hicks failed to meet this burden.
Hicks essentially argues, on brief and orally, that because the streets of Whitcomb Court were once public streets and sidewalks owned by the City of Richmond, any statute restricting his presence thereon is unconstitutionally overbroad or vague. Hicks further alleges that because the policy is overbroad and vague, it impinges upon his First Amendment guarantees of free speech and implied guarantee of free association, as well as his Fourteenth Amendment due process protections.
“[G]enerally, a litigant may challenge the constitutionality of a law only as it applies to him or her.” Id. at 463, 364 S.E.2d at 241. “The traditional rule is that a person to whom a [policy] may be constitutionally applied may not challenge that [policy] on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court.” New York v. Ferber, 458 U.S. 747, 769, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982). Yet,
[w]hat has come to be known as the First Amendment overbreadth doctrine -is one of the few exceptions to this principle and must be justified by weighty countervailing policies. The doctrine is predicated on the sensitive nature of protected expression ... [and][i]t is for this reason that we have allowed persons to attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity.
Id. The United States Supreme Court has also allowed a facial attack on the grounds of vagueness even though the litigant’s *67 own speech was unprotected. See Kolender v. Lawson, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).
Nevertheless, “where conduct and not merely speech is involved, ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the [policy’s] plainly legitimate sweep.” Ferber, 458 U.S. at 770, 102 S.Ct. at 3348. This distinction is ignored by the majority. “We have never held that a [policy] should be invalid on its face merely because it is possible to conceive of a single impermissible application____” Id. at 771, 102 S.Ct. at 3348. Instead, “[i]n a facial challenge to the overbreadth and vagueness of a law, a court’s first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.” Houston v. Hill, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987).
A policy will be deemed unconstitutionally overbroad if it is “one that is designed to burden or punish activities which are not constitutionally protected, but the [policy] includes within its scope activities which are protected by the First Amendment.” Parker v. Commonwealth, 24 Va.App. 681, 690, 485 S.E.2d 150, 154-55 (1997). A policy will be deemed unconstitutionally vague if “it does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.” Santillo v. Commonwealth, 30 Va.App. 470, 482, 517 S.E.2d 733, 739 (1999) (citation omitted).
It is axiomatic that in making such a determination, an appellate court should refrain from speculation outside of the record before it. Here, contrary to Hicks’ argument, the policy clearly does not bar individuals from freely associating with their friends or loved ones living on RRHA property, nor does it prohibit persons from exercising free expression. Further, the policy does not automatically delineate every nonresident who uses a sidewalk owned by RRHA to be a trespasser, as suggested by the majority. Instead, it merely authorizes the Richmond police, as agents of the RRHA, to *68 ban persons from the property who enter upon the property without permission from a resident or the RRHA. Significantly, any unauthorized individuals are not automatically arrested, but they are warned that they are not to enter the property in the future.[6] Further, those who have been formally banned from the property are not without recourse and can request, through the proper RRHA channels, to have the ban removed.
Thus, I would consider this policy as a “paradigmatic case of [one] whose legitimate reach dwarfs its arguably impermissible applications.” Ferber, 458 U.S. at 773, 102 S.Ct. at 3348. Under these circumstances, I would find that the policy is not “substantially overbroad” and/or vague and that “whatever overbreadth [or vagueness] may exist should be cured through a case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied.” Broadrick v. Oklahoma, 413 U.S. 601, 615-16, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973).
The majority has found that the Whitcomb Court property is a traditional public forum simply because the property in question is a sidewalk adjoining a street constructed and once owned by the City of Richmond. However, neither the evidence in this record nor the precedents of the United States Supreme Court compel such a finding. I agree that “[t]he Supreme Court has adopted a forum analysis as a means of determining when the Government’s interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum.” Paff v. Kaltenbach, 204 F.3d 425, 431 (3rd Cir.2000) (citing Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 *69 (1985)). However, “[w]hen the relevant public property is determined to be a ‘non-public forum,’ rather than an ‘open forum’ or a ‘designated forum,’ the government has greater freedom to restrict speech.” Id.
A traditional public forum is property which has the physical characteristics of a public thoroughfare, which has the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, and by which history and tradition has been used for expressive conduct. See Warren v. Fairfax County, 169 F.3d 190, 198 (4th Cir.1999) (Murnaghan, J., dissenting), adopted and incorporated by reference by the majority in Warren v. Fairfax County, 196 F.3d 186, 191 (4th Cir.1999) (en banc). As the majority also correctly points out, a sidewalk adjoining a public street will generally fall into this category. See Frisby v. Schultz, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500-01 (1988). However, the sidewalk at issue here is not the “quintessential” public sidewalk which has been “immemorially held in trust for the use of the public,” or which has been traditionally “used for public assembly and debate, the hallmarks of a traditional public forum.” See Frisby, 487 U.S. at 480-81, 108 S.Ct. at 2500; see also United States v. Grace, 461 U.S. 171, 179-80, 103 S.Ct. 1702, 1709, 75 L.Ed.2d 736 (1983) (instructing that it is incorrect to assert that every “public sidewalk” is a public forum).
While it is true that the City of Richmond cannot transform public streets and sidewalks into private, non-public property simply by passing an ordinance declaring them private or closed property, this is but one factor to consider in determining the nature of the sidewalks at issue. See Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); see also United States v. Kokinda, 497 U.S. 720, 727, 110 S.Ct. 3115, 3120, 111 L.Ed.2d 571 (1990). Moreover, contrary to the majority’s conclusion, “[t]he mere physical characteristics of the property cannot dictate forum analysis.” Kokinda, 497 U.S. at 727,110 S.Ct. at 3115. Instead, we must also consider the location and purpose of the sidewalk, in order to determine *70 its character as public or private. See id. at 728-29, 110 S.Ct. at 3115.
I agree with the majority that a “critical issue” is also whether the privatized streets continue in their previous character as a traditional public forum. However, contrary to the majority, I would find that neither the purpose, the treatment, nor the physical characteristics of the Whitcomb Court sidewalks support the majority’s conclusion that they fall within the parameters of a traditional public forum.
First, the Whitcomb Court property, including its streets and sidewalks, has been deeded from the City to the RRHA. Although ignored by the majority, a condition for the closure of the streets by the City required RRHA to “make provisions to give the appearance that the closed streets, particularly at the entrances, [were] no longer public streets and that they [were] in fact, private streets.” In order to meet this requirement, although the streets and sidewalks of the development were not physically barricaded, RRHA posted red and white signs, “approximately 18 inches to almost 24 inches by about 12 inches” in size, on each side of the buildings, as well as on the streets of the property, on each block, about every 100 feet. These signs clearly indicated that the street and sidewalks had been privatized and that trespassing was prohibited.[7] The record further indicates that RRHA held meetings with residents and provided pamphlets explaining the privatization. The pamphlet encouraged residents to explain the privatization to their neighbors and guests in order to facilitate the change. Finally, for at least a year prior to Hicks’ present arrest, RRHA and the Richmond police treated the property as private property by determining whether visitors were authorized and by banning unauthorized persons from the property.
*71 In concluding that “[t]here is no indication to the public until after they enter onto the ‘privatized’ streets that [they] are any different from the rest of the streets in the city,” the majority both improperly assumes a fact-finding function outside the record in this case and improperly shifts the burden of proof concerning the character of the forum away from Hicks. A review of the character of the “privatized” streets and sidewalks, restricted to the record of the trial court, reveals that other than exceptions for school buses, delivery trucks, city service vehicles and law enforcement, there is absolutely no evidence that the streets and/or sidewalks of the Whitcomb Court property remained open to a public flow of traffic, as the majority suggests. Furthermore, even though sidewalks “may be open to the public, [that] fact alone does not establish that such areas must be treated as traditional public fora under the First Amendment.” Kokinda, 497 U.S. at 729,110 S.Ct. at 3115.
Thus, given the clear intent by the City of Richmond to remove the streets of Whitcomb Court from the category of thoroughfares available for use by the general public and given the notice to the residents and the public at large in the form of repeated and obvious signage that the streets and sidewalks were no longer “public” in character, I would hold that the restrictions imposed by RRHA must be analyzed under the test for non-public property: they must be reasonable and “not an effort to suppress expression merely because public officials oppose the speaker’s view.” Id. at 730, 110 S.Ct. at 3115 (citing Perry Education Assn. v. Perry Local Educators’ Assn., 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)).
There is no dispute here that the stated purpose for RRHA’s trespassing enforcement effort, which was to “provide a safe environment for citizens in a place often used to sell drugs,” is reasonable and legitimate. In fact, we have previously upheld the delegation of authority by a public housing complex to police officers to bar unauthorized individuals from the property for the purpose of preventing crime, *72 protecting property and preserving the peace. See Holland v. Commonwealth, 28 Va.App. 67, 502 S.E.2d 145 (1998).
Moreover, as stated above, the record is clear that a person is not considered “unauthorized” until he or she has entered the property without the permission of either a resident or an RRHA official. Even then, and notwithstanding numerous and obvious signs that acquaint anyone able to read that the character of the property is private and not public, unless the individual is engaged in some type of criminal activity, that individual is not formally barred from the property until after he or she has been warned not to enter the property without permission. Once an individual is barred from the property, a procedure is available to request removal of the barment. Further, Hicks produced no evidence that either RRHA or the Richmond police have ever banned any form of expression based on its content.
Based on this record, I would find that any potential interference with an individual’s right of expression and/or intimate association -with residents of Whitcomb Court, or to “loiter” on the property, which, although publicly owned, in my judgment constitutes a “non-public forum” for First Amendment purposes, is reasonable, limited and justified to achieve the legitimate purpose of protecting these residents from crime. Therefore, I would hold that Hicks’ conduct at the time of his arrest — namely, knowingly trespassing on private property— was not constitutionally protected.
II. Motion to Remand
Because I would hold that RRHA’s barment "proceeding and trespass policy with respect to Hicks do not violate the First and Fourteenth Amendments, I would address the remaining assignment of error.
Hicks argues that he was entitled to have his case remanded to the general district court for a new trial before another judge because the judge of that court who presided over the initial trial improperly assumed the role of a prosecutor by “cross-examining” him.
*73 The Supreme Court of Virginia has long held that there is no inherent damage to a fair trial when a judge asks questions of a witness.
[A] trial judge [may] ask questions of a witness either on his examination in chief or on cross-examination. The practice is common and perfectly permissible. Indeed, there are times when it is his duty to do so. He is not to sit there and see a failure of justice on account of omissions to prove facts plainly within the knowledge of a witness, but the character of his questions should not be such as to disclose bias on his part, or to discredit the truthfulness of the witness. “For the purpose of eliciting evidence which has not otherwise been brought out, it is proper for the judge to put the questions to a witness either on his examination in chief or on his cross-examination, and where anything material has been omitted, it is sometimes his duty to examine a witness.”
Mazer v. Commonwealth, 142 Va. 649, 655, 128 S.E. 514, 516 (1925) (citations omitted).
In addition, we have held that “the trial court, in the exercise of its sound discretion, may permit jurors to submit written questions to be asked of a witness.” Williams v. Commonwealth, 24 Va.App. 577, 582, 484 S.E.2d 153, 155 (1997). We also noted in Williams that “[t]he function of a jury is to assure a fair and equitable resolution of all factual issues. The jury serves as the final arbiter of the facts, ‘charged with weighing the evidence, judging the credibility of the witnesses, and reaching a verdict’ in the case.” Id. at 582, 484 S.E.2d at 155. This function belongs no less to the court when serving as the fact finder. We need not determine here whether the general district court judge’s questions demonstrated an inappropriate bias or prejudice because the court granted Hicks’ motion to strike the questions as well as his answers.
In addition, the remedy provided to any defendant in a criminal case who perceives error on the part of a trial court is to exercise the right to appeal the matter to a higher tribunal. In the context of misdemeanors tried in the district courts, the *74 General Assembly has established a right to a trial de novo in the circuit court.[8] A de novo hearing means a trial anew. On appeal, a conviction in the district court is annulled, and a new trial is held in the circuit court. See Ledbetter v. Commonwealth, 18 Va.App. 805, 447 S.E.2d 250 (1994).
While it would clearly be preferable and in its interest for the Commonwealth to be represented by counsel in every case in which it is a party, the General Assembly has declined to mandate such representation. Code § 15.2-1627(B) recites the duties of Commonwealth’s Attorneys and their assistants.[9] This statute only requires Commonwealth’s Attorneys to prosecute felonies and provides that a prosecutor “may in his discretion, prosecute Class 1, 2 and 3 misdemeanors.” Thus, the General Assembly decided as a matter of policy to place the discretion for the representation of the Commonwealth in misdemeanor cases in the hands of the executive branch rather than the judicial branch of government.
Hicks relies on the decision of the Supreme Court of the United States in Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), as authority for his argument that a trial de novo does not cure errors committed in a lower court. I find his reliance on Ward is misplaced. In Ward, the Supreme Court addressed a systemic problem of bias inherent in the infrastructure of local mayors’ courts. There, mayors of villages sat as judges in the courts, and a major portion of village income was derived from the collection of these fines. In finding that such a scheme violates the due *75 process rights of criminal defendants in the mayors’ courts, Justice Brennan noted that the constitutional infirmity was grounded in the separation of powers doctrine.
Although “the mere union of the executive power and the judicial power in him cannot be said to violate due process of law,” the test is whether the mayor’s situation is one “which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused.” Plainly that “possible temptation” may also exist when the mayor’s executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor’s court.
Id. at 60, 93 S.Ct. at 80 (citations omitted).
Hicks does not allege, nor do I find, such systemic bias in the procedural structure of the district courts in the Commonwealth. Thus, assuming without deciding that the questions propounded by the general district court judge constituted error, I would hold that the trial de novo in the circuit court provided an adequate remedy.
For all of these reasons, I dissent and would affirm the judgment of the trial court.

. Contrary to the majority’s statement otherwise, Hicks presented no evidence suggesting that the warning does not inform persons that the streets and sidewalks surrounding the complex are part of RRHA property.

. Officer Llaino testified to the size, number and location of the signs and that the substance of the message on the signs was that "all the property had been privatized and that trespass[ing was] prohibited.” This evidence was uncontradicted.

. Code § 16.1-136 provides in pertinent part: "Any appeal taken under the provisions of this chapter shall be heard de novo in the appellate court and shall be tried without formal pleadings in writing; and, ... the accused shall be entitled to trial by a jury in the same manner as if he had been indicted for the offense in the circuit court.”

. Code § 15.2-1627(B) provides in pertinent part: "The attorney for the Commonwealth ... shall have the duties and powers imposed upon him by general law, including the duty of prosecuting all warrants, indictments or informations charging a felony, and he may in his discretion, prosecute Class 1, 2 and 3 misdemeanors, or any other violation, the conviction of which carries a penalty of confinement in jail, or a fine of $500 or more, or both....”